### UNITED STATES
v.
### TETSUO IZUMIHARA.
### Crim. A. No. 10758.

United States District Court
D. Hawaii.
March 26, 1954.

A. William Barlow, U. S. Atty., D. Hawaii, and Louis B. Blissard, Asst. U. S. Atty., D. Hawaii, Honolulu, Hawaii, for plaintiff.

Robert G. Hogan, Honolulu, Hawaii, for defendant.

McLAUGHLIN, Chief Judge.

It is charged in the indictment

"That on or about September 15, 1953, at the United States Army of the Pacific Personnel Center, City and County of Honolulu, Territory of Hawaii, and within the jurisdiction of this Court, Leveson Tetsuo Izumihara, being then and there a person liable for training and service under the Universal

Military Training and Service Act of 1948, and the Amendments thereto, and having theretofore registered under said Act, did knowingly, wilfully, unlawfully and feloniously fail and neglect and refuse to perform a duty required of him under and in the execution of said Act, and the Rules and Regulations duly made pursuant thereto, in that said Leveson Tetsuo Izumihara, having been classified in Class I–A–O by his local board, being Local Draft Board No. 5, created and located at Honolulu, Hawaii, under and by virtue of the provisions of the Universal Military Training and Service Act of 1948, Title 50, United States Code, Appendix, Section 451, et seq., and the Rules and Regulations issued thereunder, and said Defendant having been notified by said Board to report at the United States Army of the Pacific Personnel Center, Honolulu, Territory of Hawaii, on September 15, 1953, for induction into the Armed Forces of the United States, the action of said local board, as aforesaid, being pursuant to the power conferred upon said board by the Universal Military Training and Service Act of 1948, and the Amendments thereto, and the Rules and Regulations duly made pursuant thereto, did knowingly, wilfully, unlawfully and feloniously fail and neglect and refuse to be inducted into the Armed Forces of the United States, as aforesaid, as he was required to do by notice and order of said board, in violation of Section 462, Title 50, Appendix, United States Code."

The facts made to appear at this trial summarized are as follows:

1. The defendant registered and was classified I-A, examined and deferred as a student from August 25, 1951, until June 1952, with no claim for any consideration of any religious beliefs.

2. After the local board notified him of a pending reconsideration of his student's deferment, and asked for his report card which would show them a grade average of D, defendant, within a few days, began to claim that he was a person religiously opposed to combat and noncombatant service in the Armed Forces.

3. When asked about his religious associations teaching opposition to this type of service in the Armed Forces of this country, the defendant stated that he belonged to a sect known as Jehovah's Witnesses. When asked about the teachings or creed of Jehovah's Witnesses relative to military service, the defendant pointed to principles against bearing arms, against killing others, and taking life; all representations directed principally toward combatant participation in war.

4. When establishing religious connections in the special form questionnaire, the defendant relied heavily on his study since 1949, whereas in his interviews with the board he stated that his opinion for three years after joining in 1949 was that he did not think much of the religion but became convinced in about 1952.

5. When asked about noncombatant participation, such as care of the wounded in hospitals, or chaplain's work, he objected to being thus in the service because of a Bible passage seemingly against serving two masters. At the same time he expressed no objection to doing the same work as a civilian.

6. When asked about the delay in registering his conscientious objections (it appears from his statements that he became fully convinced about his objections a year before the interview) he advanced no explanation for his failure to register his beliefs.

7. In his notice of appeal from this classification—which notice of appeal as filed by the defendant was ineffective, not having been filed within the time limit—the defendant gave as his religious conviction his belief against shedding blood. Nevertheless, eventually the appeal taken was deemed by the appellate board to include this issue.

8. The defendant stated he was a full-time high school student when asked his occupation, and it appears also that he engaged in some religious work on week-ends and one hour of meeting in the week.

9. As to the question asked whether or not he had ever publicly expressed views now claimed by him, the defendant failed to answer that question.

As heretofore noted, the defendant's claim was that of one entitled to deferment as a conscientious objector. It was denied, and he failed to appeal within the time limit. However, as allowed by the applicable law, rules and regulations, a third person appealed in his behalf on ambiguous grounds which liberally construed by the board, encompassed the defendant's claim of being a conscientious objector as well as a person entitled to the ministerial classification. 50 U.S. C.A.Appendix, § 456(g). Accordingly— the appeal involving issues of conscientious objection to military service—the matter was referred to the hearing officer for a report and recommendation by him as an officer of the Department of Justice on the character and good faith of the defendant's claim of being a conscientious objector. Finding that the appellant predicated his claim to conscientious objection upon religious training and belief, quite properly the hearing officer inquired into the nature of the appellant's belief, and after so doing reached the conclusion that, though the appellant may have asserted belief that his subscribing to the tenets of Jehovah's Witnesses precluded his serving in the military forces of this country, said belief was not one that was founded upon any depth of knowledge or any degree of understanding, or good faith.

The hearing officer also found the appellant to be a person of limited intelligence.

He, accordingly, recommended to the appeal board that this appellant, if inducted, be classified in such a manner that he would be assigned to noncombatant service.

10. Upon receipt by the appellate board of this report and recommendation of the hearing officer, the board reviewed the appellant's file and also considered as well the report of the hearing officer just referred to, and having considered these matters upon a vote and after a full consideration of the evidence voted unanimously to classify this registrant as I-A-O. The registrant was thereafter duly notified that he was to report for induction into the military forces of this country under said classification. The registrant reported, but when directed to step forward and take the oath he declined to do so. And he was again called and he again refused to take the oath as a member of the military. At that time he was removed to the adjutant's office, where he was again informed of the situation, advised as to the felonious nature of his refusal to take the oath, and made aware of the penalty for conviction of violating the Selective Service Act. The oath was read to him. He was again called, and he again refused to step forward and be inducted. The defendant later even signed a written refusal to be inducted.

As a consequence of these facts, the defendant was indicted by the grand jury. As directed by statutes and applicable decisions, the case has been tried on the issue of whether or not there was any basis in fact to justify the action of the appeal board in classifying this registrant as I-A-O. If upon examination it was found that there was not, then under the Supreme Court decision in the Estep case (Estep v. U. S.), 1946, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567, the board lacked jurisdiction to classify the registrant I-A-O, and the prosecution in that event would fail.

The problems presented upon the motion for judgment of acquittal are complex as well as delicate. They are made all the more delicate by reason of arising within the area where religious principles seemingly conflict with civil duties. This nation is founded upon a belief in God and prides itself upon being a Christian nation of the type, however, that

distinguishes between God and Caesar. It operates on the principle that you render to Caesar the things that are Caesar's and to God the things that are God's. Probably every Christian has inculcated in his beliefs a religious obligation not to kill others, and a belief that wars, with their attending violence, are contrary to those principles. However, it has been recognized from the earliest days of our country that there are some who honestly entertain religious beliefs that are at the extreme application of those principles. There are also some, such as the defendant now before the court, who follow a rather new sect known as Jehovah's Witnesses, who believe it to be inconsistent with their religious obligations if they are required by the laws of man even to serve in any way in a temporal army.

There being a conflict between the religious beliefs entertained by members of this sect and other religions with the generally accepted principles upon which this Christian nation is founded, the Congress has enacted within the Selective Service Act an exemption whereby it is provided that if one is found by reason of religious training and belief to be opposed to combatant service, conscientiously opposed to war in any form, and to be conscientiously opposed to participation in both combatant and non-combatant training and service in the Armed Forces, that person so found shall be classified I-O, namely, as a conscientious objector available for civilian work contributing to the maintenance of national health, safety or interest. In this same connection Congress provided as a matter of law under the Universal Military Training and Service Act, 50 U.S.C.A. Appendix, § 456(j), that religious training and belief in this connection means an individual's belief in relation to a Supreme Being involving duties superior to those arising from any human relation but does not include essentially political, sociological or philosophical views or a merely personal moral code.

These exemptions, which appeared first in this form in 1940, 54 Stat. 885, § 5(g), are much more broad than those placed in the draft legislation for the first World War. In the latter it was provided that while there might be exemption from combat duty for those conscientiously opposed on religious grounds, such exemption was limited to those belonging to a "presently existing" religious group, the teachings of which prohibited such activities. It was further provided that no such conscientious objector should be entirely exempt from service, but should be required to serve in any capacity the President should declare to be noncombatant in nature. Act of May 18, 1917, 40 Stat. 76.

While the requirement of *membership in a sect* formally opposed to participation in war may be open to criticism, still the part of the 1917 Act requiring non-combat service at all events seems better adapted to the needs of the country and more equitable to all *others* who assume the duties here involved. It would seem not extreme for Congress to demand that all who will claim the privileges accorded citizens and residents of the United States, including a wide degree of religious freedom, be required to honor their beliefs and the opportunities to pursue them by defending, by noncombat means at least, the country which makes those beliefs possible.

■■ It seems clear that Congress, in the exercise of its army power, has plenary authority to require performance of the duty of military service, Selective Draft Law Cases (Arver v. U. S.), 1918, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, and it may, if it wishes, totally disregard the individual views of a draftee. See Jacobson v. Massachusetts, 1905, 197 U.S. 11, 29, 25 S.Ct. 358, 49 L.Ed. 643. Thus the exemptions are a matter of privilege, and it would seem that some restriction of the present extent of this privilege would have the desirable effect of making more secure the very religious freedom now claimed and enjoyed—not only by the conscientious objector, but by all other inhabitants of different beliefs.

Nevertheless, we are governed by the law as it now stands, with its rather broad exemption, and in the light of the exemption now carved out by Congress, what do we find here upon the record to support the action of the appellate board?

First, let us examine the most recent expression of the Supreme Court of the United States in the case of Dickinson v. United States, 1953, 74 S.Ct. 152, 346 U.S. 389. There the task of the Court was considerably easier, as is true in all cases where the truth of representations is susceptible of objective determination. The registrant asserted a claim that he was a member of Jehovah's Witnesses and was in his opinion classifiable only as a minister, because that was his occupation. He recited in support of his claim detailed facts concerning his actions as a minister, indicating that that was in fact his position and occupation, and there was no evidence in the record to dispute his representation. However, his claim to exemption was overruled and in turn the board was overruled by the Supreme Court, which said that the task of the court in cases such as this is to search the record for some affirmative evidence to support the local board's overt or implicit finding that a registrant has not painted a complete or accurate picture of his activities.

Here the claim to exemption lies not within an objective area but lies within the realm of subjective beliefs of a religious nature. Upon an examination of the entire record, including the hearing officer's report to the board, I am satisfied that the board understood this registrant to be a member of Jehovah's Witnesses. The good faith of his membership or belief in the tenets of this sect were in no way reflected upon or commented upon other than by the hearing officer, who observed that the registrant didn't understand much about what he believed, and that if he purported to be a minister he was rather a poor one. The board also from the record could understand from that which the registrant said, and from that which was said in his behalf by witnesses and documents, that he, like other members of Jehovah's Witnesses, was opposed on the basis of religious beliefs and training to combat service in that he did not believe in killing or in a bloodletting type of war. To be sure, there were some limited circumstances, as I recall, where he said he would in his opinion, consistent with his religious beliefs, condone the use of physical force, such as in defense of his own or of a member of his sect. But unmistakably he let it be known that his religious belief, to repeat, was such that he could not participate conscientiously in combat operations in military service.

So also do I deem it to have been ascertainable from this record by the board that the defendant was also representing at the same time that for like reasons, namely, religious training and belief, he personally was also opposed to performing within the military framework noncombatant service. Those are representations made according to this record by the registrant in this subjective area in support of his claim to being entitled to a classification as a conscientious objector.

■■ In the light of the Supreme Court decisions and the decision of the United States Court of Appeals for the Ninth Circuit in the case of Schuman v. United States, 208 F.2d 801, even though these are cases involving ministers, I think the same spirit of decision is applicable here. Thus, based on these representations made by this man which I have just outlined, there was nothing in the record available to this board to support its conclusion that he was *not* opposed to such service as a matter of religious principle.

Accordingly, on the basis of the reasons recited and the authorities referred to, I am going to grant the motion for judgment of acquittal. This, however, is not in any way to be interpreted as reflecting my own personal belief that the exemption carved out by the Congress at variance with our national beliefs is a wise one or that its constitutionality is beyond appropriate attack under proper

circumstances. No such question has here been raised, and I do not wish to explore that problem at this time. It well may be that examination may prove the exemption to be perfectly constitutional. But I do think that if the Congress wishes to raise an adequate army to support and defend the Constitution of the United States, it had better give in due course some more attention to the provisions of the existing law, for it would seem nonsensical to make it possible for one to avoid service in the Armed Forces by simply saying that one by virtue of his religious training and belief is a conscientious objector and daring the Government to prove, within this subjective realm, the impossible, namely, that the registrant does not have such a belief.

It is clear that in entering the field of total exemption on the basis of purely subjective religious belief, Congress has created and has undertaken to solve a real and difficult problem. Basically that problem is to permit expression of a bona fide belief against all participation in military service, and to give draft boards the power to provide necessary manpower without delay. To this has been added the insistence of the courts that the exercise of this power be not arbitrary and based upon mere suspicion. That there is basis for judicial concern is indicated by the incidence of such cases as Dickinson, supra, in which the record shows that the board did exercise its power improvidently and with no basis in fact. If one board can so act, others can, and this problem cannot be solved by giving more power on fact decisions to the boards, even if this were possible. Obviously, even if the boards had power to act on a mere basis of disbelief of the claims of the registrants, this would not solve the problem highlighted by Dickinson, supra.

It is quite possible that the only practical solution lies in facing up to the probability that, in this area as in some others, a highly-respected individual right may be found in collision with an equally important national interest, and that the individual right must give way

as the lesser of the two. This becomes more plain when it appears that under present conditions, anyone may find himself converted to such a belief when he feels the hot breath of the draft board on his neck, or even while he sits listening to pre-induction instructions at the Armed Forces Personnel Center. See, for example, Corrigan v. Secretary of the Army, 9 Cir., 211 F.2d 293. However, in view of the plenary power of Congress in this field, Selective Draft Law Cases, supra, the advisability of limiting any religious exemption to noncombat duty seems addressed to the discretion of Congress rather than to its power to deal with these problems. Such a limitation would not have a basic effect on the religious *belief* of anyone concerned, but would serve rather to require him to regulate his *acts* so that they would be in accord with the declared policy of the laws and the needs of the country. See Reynolds v. United States, 1878, 98 U.S. 145, 25 L.Ed. 244, restricting the observance of religious teachings of polygamy.

It may also be of interest to Congress that in a recent opinion of the Court of Appeals of the Second Circuit United States v. Hartman, 2 Cir., 1954, 209 F.2d 366, additional facts are brought to light regarding the elusive beliefs taught by this religious group of Jehovah's Witnesses. The opinion cites the Watchtower, one of the publications of the group, issued on February 1, 1951. The court's conclusion from the material portions is that as a matter of policy, there is no religious objection to all wars, but only to those *defined by the group* as political. Thus if a certain war should meet the definition of Jehovah's Witnesses as being theocratic or ecclesiastical, the religious objection to warfare does not apply. The court goes on to state that the intent of Congress in creating the exemption was to permit exemption when the conscientious objection was found to exist *as to wars between political entities*, and that Congress was not concerned with theocratic or religious wars. The net result of this latter point, added to the right claimed by the group to make

its own decision on what is a theocratic or otherwise acceptable war seems inescapably to be that the group is given the power to decide in which wars their religious convictions would prevent their participation, and in which they might join wholeheartedly. Probably this is a power which Congress had not the remotest intention that this or any other group should enjoy.

Be all these things as they may, based upon my understanding of the existing law, the motion for acquittal is granted. The defendant is discharged, and his bond cancelled.