DICKINSON *v.* UNITED STATES.

No. 57. Argued October 21, 1953.—Decided November 30, 1953.

*Hayden C. Covington* argued the cause and filed a brief for petitioner.

*Robert W. Ginnane* argued the cause for the United States. With him on the brief were *Acting Solicitor General Stern, Assistant Attorney General Olney, Beatrice Rosenberg* and *J. F. Bishop.*

MR. JUSTICE CLARK delivered the opinion of the Court.

The principal and decisive issue before us is whether there was a basis in fact for denying Dickinson's claim to a ministerial exemption under § 6 (g) of the Universal Military Training and Service Act, 62 Stat. 611, 50 U. S. C. App. § 456 (g).[1] After the selective service authorities denied his claim, Dickinson refused to submit to induction in defiance of his local board's induction order. For this refusal he was convicted, in the United States District Court for the Northern District of California,[2] of violating § 12 (a)[3] of the Act. The Court of Appeals for the Ninth Circuit affirmed the conviction. 203 F. 2d 336. We granted certiorari. 345 U. S. 991.

Section 6 (g) is the source of the ministerial exemption. It provides, in pertinent part, that "Regular or duly ordained ministers of religion, as defined in this title, . . . shall be exempt from training and service (but not from registration) under this title." Section

---

[1] The title was changed from the "Selective Service Act of 1948" to the "Universal Military Training and Service Act" by 65 Stat. 75.

[2] Petitioner waived trial by jury in accordance with Rule 23 of the Rules of Criminal Procedure.

[3] "[A]ny . . . person . . . who . . . refuses . . . service in the armed forces . . . or who in any manner shall knowingly fail or neglect or refuse to perform any duty required of him under or in the execution of this title, or rules, regulations, or directions made pursuant to this title . . . shall, upon conviction in any district court of the United States of competent jurisdiction, be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both such fine and imprisonment . . . ."

Dickinson was sentenced to two years' imprisonment.

16 (g) embodies Congress' definition of a "regular or duly ordained minister of religion."

"(1) The term 'duly ordained minister of religion' means a person who has been ordained, in accordance with the ceremonial, ritual, or discipline of a church, religious sect, or organization established on the basis of a community of faith and belief, doctrines and practices of a religious character, to preach and to teach the doctrines of such church, sect, or organization and to administer the rites and ceremonies thereof in public worship, and who as his regular and customary vocation preaches and teaches the principles of religion and administers the ordinances of public worship as embodied in the creed or principles of such church, sect, or organization.

"(2) The term 'regular minister of religion' means one who as his customary vocation preaches and teaches the principles of religion of a church, a religious sect, or organization of which he is a member, without having been formally ordained as a minister of religion, and who is recognized by such church, sect, or organization as a regular minister.

"(3) The term 'regular or duly ordained minister of religion' does not include a person who irregularly or incidentally preaches and teaches the principles of religion of a church, religious sect, or organization and does not include any person who may have been duly ordained a minister in accordance with the ceremonial, rite, or discipline of a church, religious sect or organization, but who does not regularly, as a vocation, teach and preach the principles of religion and administer the ordinances of public worship as embodied in the creed or principles of his church, sect, or organization."

Registrants who satisfy this definition are entitled to be classified IV–D. 32 C. F. R. § 1622.43.[4]

Dickinson, a Jehovah's Witness, originally claimed IV–D in 1948, shortly after he registered under the Act. At that time he stated, in his classification questionnaire, that he was a "regular" but not an ordained minister, and was working 40 hours a week as a radio repairman. From other documents submitted to the board it appeared that he devoted an uncertain number of hours a week leading two Bible study groups and "several hours each week" preaching to the public. On these facts he was classified I–A in July 1950. The validity of this classification is not at issue.

What is at issue is the decision of Dickinson's local board to continue him in I–A in September 1950 after he requested reclassification based on changed conditions in his vocation occurring subsequent to the filing of his questionnaire in 1948. Through his sworn testimony at a personal appearance before the board and subsequent letters to the selective service authorities, and through the affidavit of one C. David Easter, a "supervisor" for the Watchtower Bible and Tract Society in the San Francisco area, supplemented by three letters from the Society itself, Dickinson established the following uncontradicted facts.

In the Spring of 1949 Dickinson voluntarily left his 40-hour-a-week job as a radio repairman and was baptized, the mark of ordination to Jehovah's Witnesses. In August 1949 he was enrolled by national headquarters of the Watchtower Bible and Tract Society and began his work as a full-time "pioneer" minister, devoting 150 hours each month to religious efforts. This shift in Dickinson's activities occurred after February 1949

---

[4] Formerly this regulation was numbered § 1622.19, 32 C. F. R. § 1622.19 (1949).

when selection under the Act was at a standstill, regular inductions having been halted.[5] As of January 1950 Dickinson changed his residence in order to assume the role of "Company Servant" or presiding minister of the Coalinga, California, "Company," which encompassed a 5,400-square-mile area. At that time he dedicated approximately 100 hours each month to actual pioneer missionary work—delivering public sermons, door-to-door preaching, conducting home Bible studies. In the remaining 50 hours devoted to religious activities each month, Dickinson studied, planned sermons and discourses, and wrote letters connected with his work. A substantial portion of this time was spent conducting three to four meetings each week of the "Company" or congregation at a public hall in Coalinga. Dickinson arranged for and presided over these meetings, usually delivering discourses at them. He also instructed prospective ministers in the proper delivery of sermons at the "Company's" Theocratic Ministry School. Dickinson received no salary for his missionary or company servant work. He lived on $35 a month earned by a weekly average of five hours of radio repair work. This modest income, a low $15–17.50 a month rental for an apartment, self-performance of household tasks, and invitations to various private homes enabled Dickinson to subsist.

Despite this uncontroverted evidence of marked change in Dickinson's activities, the local board continued him in I–A. This ruling was affirmed by the state and national appeal boards, and he was ordered to report for induction on July 16, 1951. Dickinson reported to the

---

[5] Regular inductions resumed in August 1950. Annual Report of the Director of Selective Service 90 (1952). Since induction was not an immediate threat when Dickinson changed his activities, the change itself would hardly show bad faith, if that were an issue. However, bad faith is not at issue in cases such as this.

induction center but refused to submit to induction. His indictment and conviction followed.

At the outset it is important to underline an elemental feature of this case. The Universal Military Training and Service Act does not permit direct judicial review of selective service classification orders. Rather the Act provides, as did the 1917 and 1940 conscription Acts before it,[6] that classification orders by selective service authorities shall be "final." However, in *Estep* v. *United States,* 327 U. S. 114 (1946), a case arising under the 1940 Act, this Court said, at 122–123: "The provision making the decisions of the local boards 'final' means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes. It means that the courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous. The question of jurisdiction of the local board is reached only if there is no basis in fact for the classification which it gave the registrant."

The ministerial exemption, as was pointed out in the Senate Report accompanying the 1948 Act, "is a narrow one, intended for the leaders of the various religious faiths and not for the members generally." S. Rep. No. 1268, 80th Cong., 2d Sess. 13. Certainly all members of a religious organization or sect are not entitled to the exemption by reason of their membership, even though in their belief each is a minister. Cf. *Cox* v. *United States,* 332 U. S. 442 (1947). On the other hand, a legitimate minister cannot be, for the purposes of the Act, unfrocked simply because all the members of his sect base an exemption claim on the dogma of its faith. That would

---

[6] 40 Stat. 80 (1917), 54 Stat. 893 (1940).

leave a congregation without a cleric. Each registrant must satisfy the Act's rigid criteria for the exemption. Preaching and teaching the principles of one's sect, if performed part-time or half-time, occasionally or irregularly, are insufficient to bring a registrant under § 6 (g). These activities must be regularly performed. They must, as the statute reads, comprise the registrant's "vocation." And since the ministerial exemption is a matter of legislative grace, the selective service registrant bears the burden of clearly establishing a right to the exemption.[7]

We think Dickinson made out a case which meets the statutory criteria. He was ordained in accordance with the ritual of his sect and, according to the evidence here, he meets the vital test of regularly, as a vocation, teaching and preaching the principles of his sect and conducting public worship in the tradition of his religion. That the ordination, doctrines, or manner of preaching that his sect employs diverge from the orthodox and traditional is no concern of ours; of course the statute does not purport to impose a test of orthodoxy.

Why, then, was Dickinson denied IV–D? It may be argued that his five hours a week as a radio repairman supplied a factual basis for the denial. We think not. The statutory definition of a "regular or duly ordained minister" does not preclude all secular employment. Many preachers, including those in the more traditional and orthodox sects, may not be blessed with congregations or parishes capable of paying them a living wage. A statutory ban on all secular work would mete out draft exemptions with an uneven hand, to the detriment of those who minister to the poor and thus need some secular work in order to survive. To hold that one who supports himself by five hours of secular work each week may

---

[7] See 32 C. F. R. § 1622.1 (c).

thereby lose an exemption to which he is otherwise entitled, would be to achieve a result that Congress so wisely avoided.

The court below in affirming the conviction apparently thought the local board was free to disbelieve Dickinson's testimonial and documentary evidence even in the absence of any impeaching or contradictory evidence. The court manifested its own skepticism by pointing to Dickinson's youth, the unorthodox method of ordination by baptism, the failure to present stronger documentary evidence from Watchtower Society leaders, and the customary claim of Jehovah's Witnesses to ministerial exemptions. However, Dickinson's claims were not disputed by any evidence presented to the selective service authorities, nor was any cited by the Court of Appeals. The task of the courts in cases such as this is to search the record for some affirmative evidence to support the local board's overt or implicit finding that a registrant has not painted a complete or accurate picture of his activities. We have found none here.

Local boards are not courts of law and are not bound by traditional rules of evidence; they are given great leeway in hearing and considering a variety of material as evidence.[8] If the facts are disputed the board bears the ultimate responsibility for resolving the conflict—the courts will not interfere. Nor will the courts apply a test of "substantial evidence." However, the courts may properly insist that there be some proof that is incompatible with the registrant's proof of exemption. The local board may question a registrant under oath, subpoena witnesses to testify, and require both registrant and witnesses to produce documents. 32 C. F. R. § 1621.15. The board is authorized to obtain information

---

[8] 32 C. F. R. § 1622.1 (c). See *Lehr* v. *United States*, 139 F. 2d 919, 922 (1944).

from local, state, and national welfare and governmental agencies. 32 C. F. R. § 1621.14. The registrant's admissions, testimony of other witnesses, frequently unsolicited evidence from a registrant's neighbors, or information obtained from other agencies may produce dissidence which the boards are free to resolve. Absent such admissions or other evidence, the local boards may call on the investigative agencies of the federal government, as they would if a registrant were suspected of perjury. But when the uncontroverted evidence supporting a registrant's claim places him prima facie within the statutory exemption, dismissal of the claim solely on the basis of suspicion and speculation is both contrary to the spirit of the Act and foreign to our concepts of justice.

*Reversed.*

MR. JUSTICE JACKSON, whom MR. JUSTICE BURTON and MR. JUSTICE MINTON join, dissenting.

This Court held in *Estep* v. *United States,* 327 U. S. 114, that in a criminal prosecution under § 11 of the Selective Service Act the court must allow the registrant to prove that his local draft board acted without jurisdiction in classifying him for service. The Court cited several examples of a board acting without jurisdiction, such as where a Pennsylvania board orders a citizen and resident of Oregon to report for induction, or where a board bases classification on the registrant's color or creed in direct defiance of the applicable regulations. But the Court then made this statement: "The question of jurisdiction of the local board is reached only if there is *no basis in fact* for the classification which it gave the registrant." (Emphasis added.) The import was that a local board loses jurisdiction if there are insufficient facts in the record to support its conclusion. The ramifications of such a theory were not explored at the time and have not

been clarified by subsequent decisions.[1] But the majority opinion today squarely poses the question of whether such a theory has a place in the statutory scheme of the Selective Service Act.

When he registered for service in September 1948, petitioner was 18 years old and claimed to have been a minister of religion of the Jehovah's Witnesses for some 15 months. He had not been ordained. He had been trained as a radio engineer, still supported himself by doing radio repair work at night, and worked at this job about 40 hours a week. He conducted two religious meetings a week, each lasting an hour, and he occasionally spoke at other meetings. He also made house-to-house calls. He had prepared for the ministry, he said, by reading the Bible and other texts published by the Jehovah's Witnesses and by taking a course. After he filed his classification questionnaire, petitioner gave up his radio repair work and was ordained by baptism. He was purportedly in charge of missionary work "in a 5,400 square mile section of territory." These events on the eve of his classification and in view of his youth may have raised doubt as to his good faith. The local board and the Appeals Board, without citing their reasons, placed petitioner in Class I–A.

No allegation has been made that the local board or the Appeals Board acted fraudulently or maliciously in this matter. The only logical assumption from the classification is that the boards disbelieved part of petitioner's testimony or doubted his good faith in taking up religious work at the particular time he did. The record itself raises some suspicions, and petitioner's ap-

---

[1] *Eagles* v. *United States ex rel. Samuels*, 329 U. S. 304, 316–317; *Gibson* v. *United States*, 329 U. S. 338; *Sunal* v. *Large*, 332 U. S. 174, 176; *Cox* v. *United States*, 332 U. S. 442, 448, 451–455.

pearance before the local board may well have confirmed these suspicions.

The problem inherent in *Estep* and raised by the majority opinion today is, what is required of the board under such circumstances? It will not do for the Court as in *Estep* to say on the one hand that the board's action is not subject to "the customary scope of judicial review" and that "the courts are not to weigh the evidence," and then on the other to strike down a classification because no affirmative evidence supporting the board's conclusion appears in the record. Under today's decision, it is not sufficient that the board disbelieve the registrant. The board must find and record affirmative evidence that he has misrepresented his case—evidence which is then put to the test of substantiality by the courts. In short, the board must build a record.

There is nothing in the Act which requires this result.[2] To the contrary, the whole tenor of the Act is that the factual question of whether the registrant is entitled to the claimed exemption shall be left entirely in the hands of the board. The philosophy of the Act is that the obligations and privileges of serving in the armed forces should be shared generally, in accordance with a system of selection which is fair and just. 62 Stat. 604, 50 U. S. C. App. §§ 451–471. To that end it decrees "Except as otherwise provided in this title, every male citizen of the United States . . . who is between the ages of nineteen and twenty-six . . . shall be liable for training and

---

[2] The regulations require the local board to place in the registrant's file for appeal a summary of outside information which was considered by the board. 32 CFR, 1952 Cum. Supp., § 1626.13. We do not interpret this to mean that the board must take the affirmative in securing such information, or that nonevidentiary factors which influenced the board need be summarized, or that in any case these summaries are subject to evaluation by the courts.

service in the armed forces . . . ." 62 Stat. 605, 50 U. S. C. App. § 454 (a). The Act then sets up several deferments and exemptions including that claimed here. It is the usual rule that he who claims the benefit of exceptions in a statute carries the burden of establishing that he is entitled to them. And the decisions of the board on these matters are made "final" by the Act, except where an appeal is authorized. 62 Stat. 620, 50 U. S. C. App. § 460 (b)(3).

Even when we all interpret "final" so as to allow judicial review of the board's jurisdiction, it does not follow that jurisdiction may be lost through a lack of evidence. Despite the comment in *Estep* that the board's action is not subject to ordinary review, the Court continues to examine and weigh these purely factual determinations.

Perhaps what bothers the Court is that when no evidence is introduced against a registrant and the board fails to state its reasons for acting, there is no practical way for the trial court to determine whether the correct statutory standard has been applied. We freely admit the difficulty. However, it is one which the Court should face rather than avoid. Since the record in this case would look the same whether the board acted fraudulently, with a misconception of the law, or in good faith, how is the trial court to proceed in determining the board's jurisdiction? The board, through silence, makes the registrant's task of proving lack of jurisdiction next to impossible.

We think the Act nevertheless requires that in the absence of affirmative proof by the registrant that the board has misconstrued the law or acted arbitrarily, the board's decisions are final and not subject to judicial scrutiny. Whether there is sufficient evidence to grant the exemption is to be left wholly with the board. The Court does not sit here to weigh the evidence. All factual questions are for the board, and its decision is final. The Court

may not set aside the board's finding because the Court might have reached a different conclusion. If it is said that this puts an awesome power in the hands of the selective service authorities, we can only reply that conscription is an awesome business. Congress must have weighed this fact when it passed the Act. It must also have realized that to allow each registrant who is denied exemption a trial on the facts would be to place an impossible block in the way of conscription.