Harold Glenn PATE, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 16078.

United States Court of Appeals
Fifth Circuit.

March 27, 1957.

# 100

Victor V. Blackwell, Covington, La., for appellant.

Richard T. Watson, Asst. U. S. Atty., Robert E. Hauberg, U. S. Atty., Jackson, Miss., for appellee.

Before HUTCHESON, Chief Judge, and RIVES and BROWN, Circuit Judges.

HUTCHESON, Chief Judge.

Classified by the Appeal Board as 1–O, Conscientious Objector, after the Local Board had classified him as 1–A, and ordered by the Local Board to report on February 1, 1954, for civilian work contributing to the maintenance, national health, safety, and interest, defendant-appellant failed and refused to do so.

Charged on September 15, 1954, in a one count indictment with violation of the Universal Military Training and Service Act, Sec. 462, Title 50 U.S.C.A. Appendix, in refusing to perform civilian work as ordered by his Local Board, he pleaded not guilty thereto, and, a jury waived, was tried by the court without a jury.

The evidence concluded, and his motion [1] for judgment of acquittal denied, he was found guilty as charged, and sentenced to the custody of the Attorney General for a period of two years.

Appealing from the judgment of conviction, defendant is here insisting that the action of the Local Board, on which his conviction is based, denied him due process of law in the respects complained of by him in his motion for acquittal, note 1, supra, and that the court erred in denying his motion and finding him guilty.

Pointing in support of his contentions to the undisputed facts in the record,[2]

1. In it, in points numbered 1 to 4, he claimed:

(1) that the board's refusal to recognize his claim to ministerial exemption and accord him the 4–D classification requested was without basis in fact, arbitrary, capricious and contrary to the acts and regulations;

(2) that the denial was illegal, arbitrary and capricious because the board employed artificial and orthodox standards in determining his claim to be a minister of religion, rather than following the definition of a minister contained in the act and regulations;

(3) that the denial was arbitrary and capricious because the board erroneously held that the defendant's performance of part time secular work defeated the ministerial claim, though, under the undisputed evidence, he is, in conformity with the act and regulations, customarily engaged in teaching and preaching the doctrines and principles of an organized church;

(4) that the denial was arbitrary and capricious in that the board erroneously held that, because defendant did not earn his livelihood from the ministry, but earned it principally at farming and not at preaching, he was not entitled to the ministerial classification claimed.

Point 5 presented the claim that the Local Board deprived him of due process under the Fifth Amendment by failing to have and keep posted at the office of the Local Board, the names and addresses of the advisers to registrants as required by 1604.41 of the regulation.

2. These facts are:

Defendant registered Feb. 8, 1951. On Dec. 1, 1951, he wrote to the local board under the new selective service system concerning conscientious objectors, "I am a student preparing for the ministry and confined to my studies and also I am obligated to provide for my family. I might not could go where the regulation prescribes under any circumstances, although I am a conscientious objector to combatant and non-combatant service. Under the circumstances, I am not signing it."

On Jan. 18, 1952, because he was attending school at the time, he was given a 1–S, High School, classification.

On Dec. 29, 1952, defendant notified the local selective service board by letter that he was no longer attending high school and had entered the full time ministry.

On Jan. 16, 1953, his classification was changed to 1–A.

On Jan. 21, 1953, the registrant wrote the board a letter advising it that he was dissatisfied with his classification and requesting a personal appearance before the board and a 4–D classification. The letter stated:

"I have been a full-time pioneer minister of Jehovah's Witnesses since Aug. 1, 1952. At present I am working with my brother Franklin Lamar Pate, a graduate

and citing as controlling under these facts, Dickinson v. U. S., 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132; Rowell v. United States, 5 Cir., 223 F.2d 863; United States v. Ransom, 7 Cir., 223 F.2d 15; appellant presents his argument under these points:

*Point One:* (A) Defendant was denied due process of law by all the draft boards because the denial of the claim for exemption as a min-

of the Watch Tower Bible College of South Lansing, New York. My brother has served as a missionary and minister in the British West Indies and throughout the United States. We are now doing missionary and ministerial work in Choctaw County, Mississippi.

"As I am now a full-time pioneer minister and have been duly ordained in accordance with the regulations of the Watch Tower Bible and Tract Society, I should be given a 4–D classification.

"Enclosed is my Ordination Certificate which I wish you would carefully consider, and make the proper classification so as to avoid an injustice.

"Please notify me of the date I can personally appear before the Local Board."

The certificate for pioneer issued by the Watchtower Bible and Tract Society, Brooklyn, New York read as follows:

"This is to certify that Harold G. Pate is a duly ordained minister of Jehovah's Witnesses, engaged, as his customary vocation, in preaching and teaching the principles of this Society and administering the rites and ceremonies thereof in public worship.

"He has been duly ordained in accordance with the principles prescribed by this Society. This was by a public ceremonial Feb. 17, 1952, whereby he confessed in the presence of witnesses that his life was thereafter dedicated to service of Almighty God Jehovah as a minister and to follow in the footsteps of Christ Jesus preaching His kingdom of righteousness. Since such date he has been recognized by this Society as qualified to represent it in such capacity.

"He was duly appointed on Aug. 1, 1952, as a 'pioneer' minister and acts as a direct representative of this organization and has since been organizing and establishing churches and generally preaching the doctrines and principles of Jehovah's Witnesses in a territory as-

ister was without basis in fact, arbitrary and capricious and violative of the act and regulations.

(B) The defendant was denied due process of law because the draft boards employed artificial and orthodox standards in determining what constitutes a minister of religion, and erroneously held that part-time secular work defeated the ministerial claim, and erroneously held that,

signed to him. He is authorized to perform the ordinary rites and ceremonies recognized and employed by Jehovah's Witnesses, such as the marriage ceremony, the baptismal ceremony, the burial ceremony, etc.

"He is therefore declared and certified by this Society to be, in accordance with its principles, a duly ordained minister, having the qualifications to preach 'the gospel of God's kingdom'.—Isaiah 61:1, 2; Matthew 24–14.

"Watchtower B. & T. Society, Inc.
T. J. Sullivan

"Superintendent of Ministers and Evangelists."

"At the hearing afforded him on July 20, 1953, according to the testimony of Shannon, chairman of the draft board, the defendant said: that, to obtain the certificate and to be considered a pioneer minister, he was required to put in 1200 hours per year in mission work for his church, and that he had put in 1200 hours a year as such pioneer; that no particular period of the year was required for this work, that he could do it at any time, "maybe after the crop was laid by or whatever time was convenient"; that, in other words, he stated that he had no required hours or week or month.

Shannon also testified: that registrant stated that every member of his church was a minister and that they had no expensive church but the ministers went from house to house; that he also stated that, in addition to his pioneer ministry, he helped farm 40 acres of land; and that registrant also stated that he received his livelihood from the farm and not from ministerial work.

Asked if he was testifying that the ministerial status was denied registrant by the board because he went from house to house preaching, Shannon said, "No, I said we did not feel that 1200 hours a year would constitute a full time status."

Further asked, "But you also testified that, because he said all members of his

because defendant did not earn his livelihood from the ministry and did not have a pulpit, he was not entitled to the ministerial classification, all contrary to the act and regulations.

*Point Two:* The local board deprived the defendant of procedural due process guaranteed by the Fifth Amendment by failing to keep posted at the office of the local board the names and addresses of the advisors to registrants, as required by Sec. 1604.41 of the regulations.

Urging upon us that the record shows without dispute that, long before the date of defendant's classification, he had advised the board that he was training for the ministry and had submitted proof, in the form of a certificate from the Watchtower Bible and Tract Society, that he was an ordained minister of religion, teaching and preaching the tenets of his faith; and that he had testified without contradiction: that such was his regular vocation or work; that he had been training for such work for many years; and that he was devoting a minimum of 1200 hours per year to the actual preaching work; appellant points out that there is not a line of evidence to dispute these facts.

Arguing: that the board's conclusion was reached without any evidence to sustain it; that the board seemed to base its classification on the fact that the 1200 hours per year which registrant stated he was *obligated* to give to the ministry was all the time that he gave to it, and that this was not enough; appellant insists that the board's order and action were without support in the evidence and, therefore, will not support the verdict and judgment.

 We agree that this is so. The law does not require that a minister give all of his time to the ministry. The fact that it is his vocation and life's work is sufficient. The board did not ask the defendant for witnesses or testimony further corroborating his position, and no contrary evidence to that offered by the defendant was taken by the board. In these circumstances, there was no basis in fact for not believing defendant's testimony and giving it full effect. Indeed, the board witnesses conceded that they did not disbelieve registrant's testimony but they did not give it effect because they did not think that what he testified to was legally sufficient to entitle him to the classification asked.

In addition to the fact that the board's order is without basis in fact, we think its validity is further destroyed by the attitude of the board toward defendant and his claim, evidenced by the reasons frankly assigned by the members of the board for their action.[3] What is present-

church were ministers, you couldn't believe him?", he answered, "I did not say I could not believe him."

Q: "Did you believe him?" An. "I believed he said he put in 1200 hours a year."

3. The witness Shannon was asked the following questions and gave the following answers:

"Q. From your knowledge of ministers and from the evidence you took at these hearings, was there any evidence introduced by this registrant to show that he was a minister as you know a minister? A. No, sir.

"Q. Under what theory did this local board #30 refuse to classify this registrant as a minister? A. Well on two grounds. One that 1200 hours a year is not enough to be considered a full time minister; and second, he said he did not get his livelihood from that, and outside

a few expenses that was all he derived from that work."

On cross examination:

"Q. Do you question that that document from the Watchtower Bible Society is a genuine certificate? A. No, I don't question that, but when the registrant says, 'Every member of our church is a minister and is considered a minister,' how could we defer the whole Jehovah's Witnesses bunch because they go from house to house preaching?

"Q. Was this fellow asking you to defer the entire group of Jehovah's Witnesses? A. No, sir.

"Q. Weren't you confined to just his case? A. Yes, sir.

"Q. Then, by your testimony, you denied him a ministerial status because he went from house to house preaching? A. No, I said we didn't feel that 1200

ed in this case is the same phenomenon which has been presented in many other cases of this kind. This is that, even though the defendant is a full time and pioneer minister of Jehovah's Witnesses, the general attitude of the board and the public toward these claims is hostile and unbelieving, and instead of applying the law as written to the facts as testified to, the board in effect rewrites the law to require duties and conditions which the law does not require. Therefore, here, in addition to the non-existence in the record of evidence to rebut the defendant's prima facie case, there are the further undisputed facts that the draft boards employed standards applicable to ministers of orthodox churches instead of those standards fixed in the law and applicable here, and thus erroneously held: that part time secular work, from which defendant earned all his livelihood, defeated the ministerial claim; and that, because he did not earn any part of his livelihood from his ministry, he could not be regarded as a minister.

As appellant correctly declares in his brief, the real trouble here is, as it has been in many other cases, that the local board has tried to fit and mold an ordained pioneer minister of Jehovah's Witnesses into the orthodox straight-jacket of ministers of an orthodox church, in the face of the fact that it is impossible to fit the garments of orthodoxy on a pioneer minister of Jehovah's Witnesses, and that by their footless effort to do so, the local board erred to the prejudice of defendant and to the denial of rights accorded him by the act and regulations.

■ *Nowhere in them is there a requirement that a minister earn his livelihood from the ministry or from a particular congregation, or that he have a pulpit before he can claim and receive classification as a minister.* All that the act and regulations require in order for one to qualify as a minister and to receive the classification is that the ministry be his vocation, not an incidental thing in his life. Sec. 16(g) (1) (2) (3), Universal Military Training and Service Act, 50 U.S.C.A.Appendix, § 466(g) (1–3). Once he makes such a showing, as undeniably defendant did in this case, then he is entitled, not as a matter of grace but as a matter of right to the statutory exemption and the classification sought.

■ Finally, it appears beyond question from the testimony of the members of the local board, that the board did not consider the defendant's status from the standpoint of the facts of his case as applied to the law and regulations but upon the erroneous conclusion emphasized and acted upon, that, since all of Jehovah's Witnesses claimed to be ministers and all could not be, the claim of the registrant in this case was, on its face, fraudulent and unsound.

In Olvera v. United States, 5 Cir., 223 F.2d 880, where a ministerial classification had been denied a Jehovah's Witnesses appellant, this court, following the teachings of the Supreme Court in Dickinson's case, supra, and in the four draft cases, Witmer, Sicurella, Simmons and Gonzales, all against the United States, reported in 348 U.S. at pages 375, 385, 397, and 407, 75 S.Ct. 392, 403, 397, 409, 99 L.Ed. 428, 436, 453, 467, held that, while the courts will not review the facts where there are any which could support the board's decision, a classification made without any basis in fact or in disregard of procedural due process is a nullity, and orders based upon such classification cannot be made

---

hours a year would constitute a full time status.

"Q. Now, if this registrant had had a regular church, the fact that he engaged in farming, would that have precluded him from a 4–D status? A. No, sir.

"Q. One of the main reasons you denied him this ministerial classification was that he did not have a fixed church? A. He did not have a fixed church, a fixed number of hours, and a fixed income from that source."

There was more to the same effect, but this is sufficient to show the attitude and motivation of the board.

the basis of, or support, a conviction.[4] Cf. Arndt v. United States, 5 Cir., 222 F.2d 485.

In Ransom's case, supra, 223 F.2d at page 17 the court correctly declared:

"It has been firmly established by the Supreme Court that when a registrant makes a prima facie showing for a desired classification, the board may not deny him that classification unless it has a 'basis in fact' for the denial. Dickinson v. U. S., 346 U.S. 389, 74 S.Ct. 152, * * *" and that "If a registrant makes a prima facie showing of right to a new classification, the board cannot refuse to give it to him unless it has at least a basis in fact for that refusal."

and further declared at page 18:

"We cannot validly distinguish for draft purposes between ministers of Jehovah's Witnesses who preach from door to door and on street corners at their vocations, and ministers of more conventional faiths who preach in pulpits, teach in church schools or carry on various other religious activities for their churches. * * *"

Clearly distinguishing the case from the same circuit, United States v. Diercks, 7 Cir., 223 F.2d 12, on which the government and the district court relied, the court in that case pointed out that Diercks did not, and Ransom did, show that he was actually spending at least 100 hours per month preaching, while Diercks had a full time position as an insurance salesman.

According to the uncontradicted testimony in this record, the local board's witnesses in effect testified on the trial that they believed that the facts were as the defendant testified to them, but that they just didn't think that those facts added up to a ministerial classification, according to the board's view of what a minister is or ought to be.

Upon the record in this case the refusal of the requested classification was made, not because of the absence of facts or because of considerations of credibility,—it was made upon and entirely upon the refusal of the board to accept and apply to appellant's case the standards established by the law and the regulations.

▮ Because, under these views, the judgment must be reversed with directions to acquit the defendant, it is sufficient in respect of defendant's Point Two, that the board deprived him of due process by its failure to keep posted the names and addresses of advisers to registrants, to cite in opposition Rowton v. United States, 6 Cir., 229 F.2d 421, certiorari denied 351 U.S. 930, 76 S.Ct. 788, 100 L.Ed. 1460, and United States v. Manns, 7 Cir., 232 F.2d 709, and to say that we agree with the holding in them that the point is not well taken. As was true in those cases, no showing whatever was made here that the complained of failure had or could have had any effect upon the defendant's presentation of his case to the board. Indeed, the record shows that he presented it adequately and well, and it further shows that he had the benefit of the advice of a representative from the State's Selective Service Headquarters.

For the error in refusing defendant's motion for judgment, the judgment is

4. What we said in Olvera's case, applies with full force here:

"* * * It is particularly difficult for laymen, charged with the duty of raising an army by draft, to avoid translating into action what certainly seems a basically just feeling that a few should not be permitted, at the expense of the many, to enjoy the blessings of liberty without paying their share of its price. Natural and understandable as these feelings are, however, it is for the congress, and not for the boards and the judges, to take them into account except as sharpeners of their consciences, and, therefore, of their consciousness of the difficult and delicate task imposed upon them to do justice under the law, at all times and under all circumstances in cases of this kind, to those whose beliefs some at least of the triers do not approve of and some cannot or will not understand." 223 F.2d at page 883.

reversed and the cause is remanded with directions to enter a judgment of acquittal.

RIVES, Circuit Judge (dissenting).

With deep regret, I am constrained respectfully to dissent. Reading, rereading and carefully studying the record as a whole, I am impressed with the fairness, consideration, and discernment of the members of the Local Board, and agree fully with the finding of the district court that,

"The Board was not hostile to him, had no ill will toward him, but gave him every opportunity he requested to present any further facts, and its decision was not arbitrary or capricious, but was based upon facts before it."

The only evidence before the Board as to the time appellant actually devoted to the ministry was the recital in his certificate of ordination that under his obligations to Jehovah's Witnesses he was required to put in a total number of 1200 hours per year, and appellant's statement that he did. As one of the Board members testified:

"Q. Outside of this certificate which has been introduced here from the Watch Tower Bible Society, did this registrant ever introduce any evidence whatsoever before this Local Board to show that he was a minister, practicing as such? A. We asked him about that and he said they did not have any regular church like other denominations and other religions and he would not have a letter from some church saying he was a minister."

The Board was accustomed to accepting letters from other churches, and in fairness to appellant, it proceeded on the assumption that he actually devoted twelve hundred hours a year to the ministry. The courts, I think, should follow the Board in that assumption.

It seems clear to me, however, that there was ample basis in fact from which the Board could conclude that farming, rather than the ministry, was appellant's vocation. Indeed, before the Board the appellant himself so stated:

"Q. Did you go into his vocation during these meetings? I mean as to what his vocation was? A. Yes. sir.

"Q. Did he state what vocation he was in? A. He stated he was farming as his vocation.

"Q. Did he say where he was farming? A. The place he rented was 40 acres, I believe."

His statement before the Board as to his ministerial work, according to one of the Board members, was as follows:

"Q. What evidence, if any, did this Defendant present to your Board to show that he was a full time minister? A. I don't know if that is the meeting or not, but at one time he presented this certificate —a pioneer preacher, or some kind of pioneer.

"Q. Did he say what amount of work he did? A. All he said was it would take about 1200 hours a year; that was what was required to get that certificate.

"Q. Did he say he put in 1200 hours a year as such? A. He said he did.

"Q. Did he tell you what period of the year he was required to put in 1200 hours? A. As I remember, he said he could do it all at once, maybe after the crop was laid by, or whatever time was convenient to him."

The same member testified: "he stated that he farmed and that he did ministerial work, but it seemed that his farm work took more of his time than his ministerial work."

In the light of that evidence, the Board summarized its findings as follows:

"This registrant's classification was re-opened at this Board meeting, since the registrant had submitted a Certificate for Pioneer Minister

from the Watchtower Bible and Tract Society in the meantime.

"This registrant stated that he farms 40 acres of land and does not have a regular church in which he preaches, and that he gets his livelihood from the farm and not from his ministerial work. He also made the statement that he is not asking for classification as a Conscientious Objector, but as a minister (IV-D). He states that he is required to put in 1200 hours per year in missionary work for his church (Jehovah's Witnesses), in order to be considered a Pioneer Minister.

"The members of the Board did not feel that they could give him a IV-D classification. They did not feel that he was entitled to it. He was given another chance to change his request to a request for a Conscientious Objector's classification, but he refused, stating that he was asking for a IV-D classification.

"The Board based their refusal on SS Reg. 1622.43, Section 3 of Par. (b). They feel that he does not regularly, as his vocation practice his duties as a minister since he states that he makes his living from his farm. Farming takes up quite a big portion of one's time if one makes a living from it."

The findings of the district court are to like effect:

"The evidence showed, as a matter of fact, that farming was his vocation and his livelihood, and that he was not required to devote any definite number of hours per week or month to his ministerial activities, and that it was necessary for him in order to be ordained as a minister to devote twelve hundred hours per year, but that this could be done after the crops had been attended to."

It is not the function of the courts to say what ministers should or should not be exempt. Congress has limited the exemption to "regular or duly ordained ministers of religion, as defined in this title," 50 U.S.C.A. Appendix, 456(g), and has carefully and even repetitively, provided in its definition that the ministry must be "his regular and customary vocation" and has specifically excluded from the exemption a person "who irregularly or incidentally preaches and teaches * * *" or "who does not regularly, as a vocation, teach and preach * * *," 50 U.S.C.A. Appendix, 466 (g).

The narrow scope of review, and the very limited function of the courts, has been repeatedly stated by the Supreme Court, the last time, I believe, in Witmer v. United States, 348 U.S. 375, 380, 381, 75 S.Ct. 392, 395, 99 L.Ed. 428:

"It is well to remember that it is not for the courts to sit as super draft boards, substituting their judgments on the weight of the evidence for those of the designated agencies. Nor should they look for substantial evidence to support such determinations. Dickinson v. United States, 346 U.S. 389, 396, 1953, [74 S.Ct. 152, 157, 98 L.Ed. 132]. The classification can be overturned only if it has 'no basis in fact.' Estep v. United States, 327 U.S. 114, 122, 1946, [66 S.Ct. 423, 427, 90 L. Ed. 567]."

In the present case, it seems to me that there was no basis in fact upon which the Board could find that the appellant preached and taught "regularly" when the evidence was undisputed that he could fit in the required 1200 hours per year after his crops were laid by or at any other time. Further, I think that the Board had ample basis in fact to find that the ministry was not appellant's vocation. Indeed, in my opinion, no previous case has gone so far as this one.

"* * * he (Dickinson) dedicated approximately 100 hours each month to actual pioneer missionary work—delivering public sermons, door-to-door preaching, conducting home Bible studies. In the remaining 50 hours devoted to religious

activities each month, Dickinson studied, planned sermons and discourses, and wrote letters connected with his work. A substantial portion of this time was spent conducting three to four meetings each week of the 'Company' or congregation at a public hall in Coalinga. Dickinson arranged for and presided over these meetings, usually delivering discourses at them. He also instructed prospective ministers in the proper delivery of sermons at the 'Company's' Theocratic Ministry School. Dickinson received no salary for his missionary or company servant work. He lived on $35 a month earned by a weekly average of five hours of radio repair work. This modest income, a low $15–17.50, a month rental for an apartment, self-performance of household tasks, and invitations to various private homes enabled Dickinson to subsist." Dickinson v. United States, 346 U.S. 389, 393, 74 S.Ct. 152, 156.

Rowell was a "regular, full-time minister" and had no "other vocation or part-time job." Rowell v. United States, 5 Cir., 223 F.2d 863, 865.

Ransom spent "at least 100 hours per month preaching," "he had certain administrative duties within his group of Witnesses and helped preside at their religious meetings in addition to his 100 hours per month spent preaching from door to door." "His only secular activity was about one day per week spent working on his parent's farm for his board and room." United States v. Ransom, 7 Cir., 223 F.2d 15, 18.

The district judge thought that the authority applicable to the facts of this case is that of United States v. Diercks, 7 Cir., 223 F.2d 12, 14, certiorari denied 350 U.S. 841, 76 S.Ct. 81, 100 L.Ed. 750.

"[Diercks'] request showed that he had been appointed a 'Pioneer' minister on October 1, 1952, and that he was ' * * * required to serve in the field on the basis of a quota of 100 hours a month * * *.' He made no showing that he was,

in fact, putting in 100 hours per month, although from the beginning he claimed to be a minister in spite of putting in 40 hours a week as a farmer and later, while putting in a full work-week in the insurance business." 223 F.2d at page 14.

In Diercks' case, the judgment of conviction was affirmed.

United States v. Lebherz, D.C.N.J., 129 F.Supp. 444, 452, 453, involved the claims of four defendants to exemption. The district court said:

"The facts as they were found, reveal, at the very best, preaching and teaching or Bible reading, no more than half-time in relation to secular work. It certainly does not appear to be each defendant's vocation in the sense in which that word is used in the statute and in court decisions. True, the statutory definition of a 'regular or duly ordained minister' does not preclude all secular employment. However, there is a definite, factual basis afforded each draft board in each case before us to supply a sufficient basis for the denial of a ministerial classification. The Dickinson case merely held that one who supports himself by *five hours* (emphasis supplied) of secular work each week as against 150 hours monthly devoted to religious activity, places himself prima facie within the statutory exemption, and a dismissal of such a registrant's claim to exemption without affirmative evidence to support such a finding, is contrary to the intent and purpose of the Act.

"There is no dispute here as to the evidence presented by each defendant to substantiate his claim to being a minister of his particular faith. Each defendant has failed, however, to establish such a course of conduct as to fulfill the requirements needed to establish a right to exemption as a minister. Moreover, it must be remembered that only when there is a classification which is arbitrary and capricious can the

courts make determinations. The courts do not weigh the evidence and then decide; they may only determine whether there is a basis in fact for the draft board's classification. The local board bears the initial responsibility for resolving the conflict. The courts will insist only that there be some proof that is incompatible with the registrant's proof of his status as a minister entitled to exemption.

"In each of these cases there is a warrantable basis for the decision of the board, which makes that decision neither arbitrary nor capricious."

In United States v. Kahl, D.C.E.D. Mich., 141 F.Supp. 161, 165, Kahl worked in his father's store from 20 to 30 hours per week, totalling 90 to 135 hours each month, and devoted about 100 hours "each month" to the Jehovah Witnesses. The district court said:

"Finally, we believe that the court in Dickinson v. United States, supra, clearly holds that registrant shall be a duly ordained minister working at his regular duties more than half time and that his secular work must be somewhat less than his ministerial duties. He must be a full time minister who perhaps, to subsist and because of his zeal and enthusiasm and that of his followers, calls for a sacrifice on his part in order to live. But that he may not be regularly employed longer at secular work or part-time work than the time devoted by him to his ministry."

In no previous case, I believe, has the board's decision been held beyond its jurisdiction when the evidence before the board failed to show that the applicant for exemption worked "regularly" as a minister, or affirmatively showed that he devoted the major part of his time to some other vocation.

Members of local boards, as patriotic citizens, give freely of their time toward helping our Country to be prepared to defend itself and all of us against aggression. When they act with the patience, kindness, and consideration shown by

this Board, they deserve wholehearted support of all of their fellow citizens. When their acts are within the framework of the law, within their jurisdiction, and have a basis in fact, the courts have no power to set them aside. I would affirm the judgment of the district court, and therefore respectfully dissent.