Elmer B. WIGGINS, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 17094.

United States Court of Appeals
Fifth Circuit.

Nov. 26, 1958.

**114**

Victor V. Blackwell, Covington, La., for appellant.

Ralph Kennamer, U. S. Atty., Thomas M. Haas, Asst. U. S. Atty., Mobile, Ala., for appellee.

Before RIVES, BROWN and WISDOM, Circuit Judges.

1. In Estep v. United States, 1945, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567, the Supreme Court ruled that although the statutory provision that orders of draft boards shall be "final" precludes the

WISDOM, Circuit Judge.

This is another case in which a Jehovah's Witness claims an exemption from selective service on the ground that he is a minister. The Court's review is directed to determining whether there was any basis in fact for the local draft board's denial of the ministerial exemption to the registrant.

Elmer Wiggins, defendant, of Bay Minette, Alabama, claimed an exemption as a minister and also claimed status as a conscientious objector. His local board classified him as a conscientious objector, denying him the ministerial exemption. On refusing to perform the civilian duty prescribed for him as a conscientious objector, Wiggins was indicted for violating the Universal Military Training and Service Act, 50 U.S.C.A.Appendix, § 462. He was tried without a jury, convicted, and sentenced to serve two years in the custody of the Attorney General of the United States. He appeals to this Court. We reverse the judgment of the district court.

**I.**

In the Universal Military Training and Service Act Congress limited the scope of judicial review more severely than Congress usually limits review of administrative action. The Act provides that decisions of the local board are "final". 50 U.S.C.A.Appendix, § 460(b) (3). Judicial interpretation of "final" however is that it means something quite short of finality in the congressional grant of jurisdiction to local draft boards. Dickinson, following Estep, has established beyond any argument at this point that "courts may properly insist [that when a local board denies a claimed exemption] there must be some proof that is incompatible with the registrant's proof of exemption"; "a local board loses jurisdiction if there are insufficient facts in the record to support its conclusion [1]". In applying this principle, an expanding

customary scope of judicial review, and forbids courts to weigh the evidence, a board may not act without jurisdiction; it lacks jurisdiction if there is no basis in fact for the classification which it

group of cases [2] seems to bear out the minority opinion's construction of the majority opinion in Dickinson as to the consequences of the Estep-Dickinson doctrine: "[I]t is not sufficient that the board disbelieve the registrant. The board must find the record affirmative evidence that he has misrepresented his case—evidence which is then put to the test of substantiality [3] by the courts. In short, the board must build a record."

Wiggins' local board built no record. The board called no witnesses and made no effort whatever to put any evidence in the record (the selective service file) to rebut Wiggins' claim to exemption. We have to hold therefore that there was no basis in fact for the board's decision unless it can be found in Wiggins' own testimony and in the letters and statements he submitted to the board. This requires us to decide whether Wiggins made out a prima facie case.

## II.

What constitutes a prima facie case for a registrant's ministerial exemption is especially unclear when the registrant is a Jehovah's Witness. Congregation Servants, Pioneer Ministers, Bible Study Conductors, and other members of Jehovah's Witnesses who correspond to ministers in a conventional organized religion usually do not receive a salary. They must engage in some secular work in order to earn sufficient funds to carry on their religious work. To a draft board, therefore, a Witness steadily employed and earning fifty dollars a week may seem no different from any other draftee gainfully employed—although the Witness may sincerely regard the ministry as his vocation and other Witnesses may accept him as a minister. This situation is not adequately covered in the Act and Regulations. A draft board and a reviewing court are placed in the position of balancing the secular against the religious interests and activities of the registrant with uncertain guides at best and subject to conflicting philosophies of individual board members and judges in their approach to selective service. Is a ministerial exemption a grant of legislative grace to be construed narrowly in the light of the Act's purpose that the obligation of serving in the armed forces should be shared universally and equally among all American citizens? Or is a ministerial exemption a statute of religious liberty, a draft board's actions to be scrutinized closely because of somewhat considerable authoritarian powers vested in a non-legal board? A further word from Congress would be helpful [4].

gave the registrant. A registrant may secure judicial review by habeas corpus or by defense to a criminal prosecution for failure to submit to induction.

Dickinson v. United States, 1953, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132, went a step further than Estep in holding that once the registrant makes a prima facie case, the board must develop other evidence to support an adverse decision.

In Witmer v. United States, 1955, 348 U.S. 375, 75 S.Ct. 392, 396, 99 L.Ed. 428, the Court distinguished between a claim of conscientious objection where the ultimate question is the sincerity of the registrant, a purely subjective question, and a claim for a ministerial exemption where "the issue is the nature of his activities".

2. See Annett v. United States, 10 Cir., 1953, 205 F.2d 689; Jewell v. United States, 6 Cir., 1953, 208 F.2d 770; Bejelis v. United States, 6 Cir., 1953, 206 F.2d 354; Weaver v. United States, 8 Cir., 1954, 210 F.2d 815; Olvera v. United States, 5 Cir., 1955, 223 F.2d 880; Rowell v. United States, 5 Cir., 1955, 223 F.2d 863; United States v. Ransom, 7 Cir., 1955, 223 F.2d 15; Pate v. United States, 5 Cir., 1957, 243 F.2d 99.

3. See De Moss v. United States, 8 Cir., 1954, 218 F.2d 119, 121, commenting on the Court's reference to lack of substantial evidence in the opinions rendered in Annett v. United States, 10 Cir., 1953, 205 F.2d 689, 692 and Jewell v. United States, 6 Cir., 1953, 208 F.2d 770.

4. Senate Report No. 1268, 80th Cong., 2d Sess. 13 shows congressional awareness of the problem. The report states that the ministerial exemption "is a narrow one, intended for the leaders of the various religious faiths and not for the members generally. U.S.Code Cong. Service 1948, p. 2001.

Congress exempts from training and service "regular or duly ordained ministers of religion[5]". 50 U.S.C.A. Appendix, § 456(g). A minister is one who as his regular and customary vocation preaches and teaches the principles of religion of a church, a religious sect, or organization of which he is a member. The term "minister" does not include a person "who irregularly or incidentally preaches and teaches * * * or who does not regularly, as a vocation teach and preach". 50 U.S.C.A.Appendix, § 466(g).

Almost without exception courts have interpreted the ministerial exemption broadly *in a Jehovah's Witness case*. In Dickinson the Supreme Court said:

"That the ordination, doctrines, or manner of preaching that his sect employs diverge from the orthodox and traditional is no concern of ours; of course the statute does not purport to impose a test of orthodoxy. * * * The statutory definition of a 'regular or duly ordained minister' does not preclude all secular employment. Many preachers, including those in the more traditional and orthodox sects, may not be blessed with congregations or parishes capable of paying them a living wage. A statutory ban on all secular work would mete out draft exemptions with an uneven hand, to the detri-

ment of those who minister to the poor and thus need some secular work in order to survive. * * * *" Dickinson v. United States, 1953, 346 U.S. 389, 392, 395, 74 S.Ct. 152, 157.

This Court has been consistent in construing the Act broadly, having in mind: "(1) the statute under construction is a statute of religious liberty; (2) the blood of the martyrs is the seed of the church; and (3) liberty and law must go hand in hand, neither must outrun the other". Olvera v. United States, 5 Cir., 1955, 223 F.2d 880, 883. In Pate v. United States, 5 Cir., 1957, 243 F.2d 99, 103, we said that once a registrant makes a showing that ministry is his vocation "he is entitled, not as a matter of *grace* but as a matter of *right* to the statutory exemption".

In Pate we emphasized that local draft boards must not "fit the garments of orthodoxy on a pioneer minister of Jehovah's Witnesses". We held:

"Therefore, here, in addition to the non-existence in the record of evidence to rebut the defendant's prima facie case, there are the further undisputed facts that the draft boards employed standards applicable to ministers of orthodox churches instead of those standards fixed in the law and applicable here, and thus erroneously held: that part time secular work, from which defendant

---

**5.** 50 U.S.C.A.Appendix, § 466(g) provides: "(1) The term 'duly ordained minister of religion' means a person who has been ordained, in accordance with the ceremonial, ritual, or discipline of a church, religious sect, or organization established on the basis of a community of faith and belief, doctrines and practices of a religious character, to preach and to teach the doctrines of such church, sect, or organization and to administer the rites and ceremonies thereof in public worship, and who as his regular and customary vocation preaches and teaches the principles of religion and administers the ordinances of public worship as embodied in the creed or principles of such church, sect, or organization. (2) The term 'regular minister of religion' means one who as his customary vocation preaches and teaches the principles of re- ligion of a church, a religious sect, or organization of which he is a member, without having been formally ordained as a minister of religion, and who is recognized by such church, sect, or organization as a regular minister. (3) The term 'regular or duly ordained minister of religion' does not include a person who irregularly or incidentally preaches and teaches the principles of religion of a church, religious sect, or organization and does not include any person who may have been duly ordained a minister in accordance with the ceremonial, rite, or discipline of a church, religious sect or organization, but who does not regularly, as a vocation, teach and preach the principles of religion and administer the ordinances of public worship as embodied in the creed or principles of his church, sect, or organization."

earned all his livelihood, defeated the ministerial claim; and that, because he did not earn any part of his livelihood from his ministry, he could not be regarded as a minister. * * * Nowhere in them [the Act and the Regulations] is there a requirement that a minister earn his livelihood from the ministry or from a particular congregation, or that he have a pulpit before he can claim and receive classification as a minister. All that the act and regulations require in order for one to qualify as a minister and to receive the classification is that the ministry be his vocation, not an incidental thing in his life.

Similarly, in United States v. Ransom, 7 Cir., 1955, 223 F.2d 15, 18, the court pointed out:

"We cannot validly distinguish for draft purposes between ministers of Jehovah's Witnesses who preach from door to door and on street corners at their vocations, and ministers of more conventional faiths who preach in pulpits, teach in church schools or carry on various other religious activities for their churches."

See also Rowell v. United States, 5 Cir., 1955, 223 U.S. 863, and Williams v. United States, 5 Cir., 1934, 216 F.2d 350.

### III.

We turn now to the facts on which the Board based its denial of Wiggins' claim for a ministerial exemption.

Wiggins registered April 6, 1953. He was eighteen years old. In his classification questionnaire and repeatedly thereafter he stated that he had been an ordained minister in Jehovah's Witnesses since he was twelve. He has always asserted conscientious objection to war, subject to his claim for a ministerial exemption. From the very first, he has presented numerous affidavits, certificates, and letters, from his parents, from other members of Jehovah's Witnesses, and from non-members. The board classified him as 1-A.

August 26, 1953 Wiggins appeared before the local board to ask that his classification be reconsidered. The local board refused. Wiggins appealed to the regional Appeal Board. The Appeal Board sent Wiggins' file to the Department of Justice to obtain its advice on his claim as a conscientious objector. The Department of Justice recommended a 1-O classification, as a conscientious objector. There is nothing to indicate that the Department of Justice considered the ministerial exemption. In its letter of recommendation to the board, the Department pointed out that: "[The Hearing Officer] stated further that no one has appeared before him who impressed him more with his uprightness, his fine character and with his genuine sincerity and truthfulness than did the registrant". We have examined the file closely. There is little doubt as to Wiggins' character and sincerity. But the local board has never questioned his character and sincerity. Still, the board classified Wiggins as a conscientious objector only.

Wiggins was ordered to report for his physical examination September 5, 1956. At that time he stated his occupation as "crane operator". He was making $52.53 a week.

October 2, 1956 Wiggins requested that he be classified as a minister. He filed twenty-one affidavits and letters supporting his position. October 24, 1956, the board met with Wiggins, who was accompanied by his mother. The uncontradicted testimony in the district court as to this meeting throws considerable light on the board's thinking. Apparently, the board's criterion was whether Wiggins was paid for his ministerial work. Wiggins testified:

"Q: Now, did any member or members of the Board make any statement regarding your ministerial claim on that occasion?

"A: Yes, they did. If I recall, when we were discussing civilian work, I believe it was, at that hearing, the Local Board told me that to be a minister, one had to be paid, one also had to have his own church,

then I asked them after I had presented some evidence, if they would consider re-opening the case, and I asked them also as to what it would take to be a minister in their sight, and they said they did not know."

Mrs. Wiggins testified:

"Q: Now, will you tell the Court what you heard at that meeting?

"A: Well, after they had talked considerably, Elmer presented the new affidavits concerning his ministerial work from people who were not Jehovah's Witnesses, who accepted his sincerity and saw his action in doing ministerial work. Then, they still indicated they were not going to consider his ministerial claim. Elmer asked, 'If I am not a minister will you please tell me what a minister is, Mr. Faulk?'

"Mr. Faulk, a member of the Board, said 'I don't know, you will have to go to someone who knows more than I do.'

"Q: Did you hear further statement of any member of the Board?

"A: There was quite a bit of discussion, and there is one thing about what they termed a minister was, before Mr. Faulk answered this question of Elmer's and he said to him a minister can only be one that was paid, that had a diploma and had his church, and that the main thing was that they were paid for the ministerial work."

Ministers of Jehovah's Witnesses are not paid a salary, furnished a parsonage, or even given funds for necessary expenses to carry on their ministerial work. As pointed out, they have no choice except to engage in secular pursuits in order to obtain funds to make the ministry their vocation. The Act does not define a minister in terms of one who is paid for ministerial work, has a diploma and a license, preaches and teaches primarily in a church. The test under the Act is not whether a minister is paid for his ministry but whether, as a vocation, regularly, not occasionally, he teaches and preaches the principles of his religion .[6]

Jehovah's Witnesses have no ministers, in an orthodox sense. But Witnesses have their religious leaders who stand in a relation to other Witnesses as a minister stands in relation to the congregation of an orthodox religion. In this case Wiggins stood in the relation of a religious leader to other members of Jehovah's Witnesses. He was recognized as such by individual members and by the governing Body of Jehovah's Witnesses. The defendant's selective service file shows numerous uncontradicted certificates and letters of individual members that support Wiggins' account of his religious activities.

March 21, 1956 the Watchtower Bible and Tract Society, Inc., the governing body of Jehovah's Witnesses, notified the Congregation of Jehovah's Witnesses at Robertsdale, Alabama, that Elmer B. Wiggins would serve as the Book Study Conductor. This position is roughly analogous to that of an assistant minister or assistant pastor. It involves regular duties chiefly in regard to instructing in the Bible, conducting Bible study classes, preaching on street corners and on house to house calls, and training others in the work.

A congregation covers a large area. It is usually subdivided. Wiggins was in charge of the Foley, Alabama area. In addition to his other duties, regularly he transported Witnesses within his area to religious meetings, assemblies of ministers, and Bible study groups. He trav-

6. "Each registrant must satisfy the Act's rigid criteria for the exemption. Preaching and teaching the principles of one's sect, if performed part-time or half-time, occasionally or irregularly, are insufficient to bring a registrant under § 6 (g). These activities must be regularly performed. They must, as the statute reads, comprise the registrant's 'vocation.'" Dickinson v. United States, 9 Cir., 1953, 203 F.2d 336; 346 U.S. 389, 395, 74 S.Ct. 152, 156.

elled 200 to 400 miles a week in this work, receiving no remuneration for his expenses.

Wiggins' duties required him to conduct Bible study meetings every Wednesday night and every Saturday. In addition, he performed certain duties in "magazine work" for the Watchtower, the official publication of Jehovah's Witnesses. The members regard the "magazine work" as a very important part of their religious activities. Wiggins regularly attends assemblies, congregations of ministers, held three or four times a year. He has official duties at these assemblies and on several occasions has quit his job in order to attend the assemblies. He has preached regularly from a pulpit before a congregation at a fixed place.

Oscar Skooglund, Congregation Servant of the Robertsdale congregation, Jehovah's Witnesses stated that in the six months previous to October 1, 1956 Wiggins spent approximately 42 hours in door to door ministry, 34 hours conducting weekly meetings, 144 hours in biblical research and study, and 6 hours reading summary material. This amounts to approximately 38 hours a month, about one fourth of the time Wiggins spent in secular employment. Pate was a farmer, but as a "pioneer" minister he was required to spend at least 100 hours in religious activities. Pate v. United States, 5 Cir., 1957, 243 F.2d 99, 104. Ransom spent "at least 100 hours per month preaching", had other duties, and helped preside at meetings. His only secular activity was farming one day a week on his parents' farm. United States v. Ransom, 7 Cir., 1955, 223 F.2d 15. In United States v. Kahl, D.C.Mich., 1956, 141 F.Supp. 161, Kahl spent 90 to 135 hours a month on secular work and 100 hours a month on ministerial work. Dickinson spent 25 hours a month on secular work as against 150 hours on religious activities, 1953, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132.

■ The time spent in secular employment as against the time spent regularly in religious activities is an important factor in deciding whether a man is entitled to an exemption as a minister. It is not the sole or necessarily conducive factor. Some allowance must be made for ministers who are gainfully employed simply because they are not paid for their religious ministry. If they must work, they should not be penalized for working steadily. A young man such as Wiggins could hardly work less than forty hours a week as crane operator and hold on to his job.

■ In this case Wiggins has shown that he dedicated himself at an early age to serving Jehovah's Witnesses; that he regarded this endeavor as his chief purpose in life, the secular employment being incidental. He has shown that he stood in the relation of a religious leader to other members of his faith, in a capacity comparable to that of an assistant pastor. He has shown that he performed his religious duties regularly, without allowing his secular work to interfere with his religious work. We hold that a crane operator working a forty-hour week may be a minister in Jehovah's Witnesses and entitled to the ministerial exemption under the Selective Service Act, although spending only forty hours a month on religious duties.

■ We are inclined to the view that the close case before us is just such a case as might have prompted Congress to vest draft boards with *"final"* authority in deciding classifications and exemptions. The patient members of Local Draft Board No. 2 of Bay Minette, Alabama, who struggled with this case for four years, are in a better position than we to determine the facts and weigh credibility; they should be able to weigh credibility. However, because of the broad view of this ministerial exemption adopted by the Supreme Court and applied in various decisions in this circuit, we feel constrained to hold that Wiggins made out a prima facie case and that there was no basis in fact for the board to deny him an exemption as a minister.

Judgment is

Reversed.