UNITED STATES of America

v.

Donald Macio HURT, Appellant.

No. 12083.

United States Court of Appeals Third Circuit.

Argued April 2, 1957.

Decided May 3, 1957.

Hayden C. Covington, Brooklyn, N. Y., for appellant.

John D. Wooley, Asst. U. S. Atty., Newark, N. J. (Chester A. Weidenburner, U. S. Atty., Newark, N. J., on the brief), for appellee.

Before MARIS, KALODNER and STALEY, Circuit Judges.

MARIS, Circuit Judge.

The question presented on this appeal by the defendant, Donald Macio Hurt, from his conviction in the District Court for the District of New Jersey of violating the Universal Military Training and Service Act[1] is whether the trial judge erred in denying the defendant's motion for judgment of acquittal. The answer turns on whether there is basis in fact for the action of the Selective Service authorities in refusing to classify Hurt as a minister under the Act. The record before the Selective Service authorities disclosed the following undisputed facts:

Hurt, at the age of 18, registered on October 22, 1951 with Selective Service Local Board No. 33 in Asbury Park, New Jersey. A classification questionnaire was sent to him by the board in which and in his accompanying letter he stated that he had served regularly as a minister of Jehovah's Witnesses since January 15, 1946; that he had been formally ordained on August 9, 1946 at Cleveland, Ohio, when he was baptized into Jehovah's Witnesses; that he was a student preparing for the ministry under the direction of the Watchtower Bible and Tract Society attending Kingdom Hall at 1010 Corlies Avenue, Neptune, New Jersey, and that he was pursuing a full time course of instruction leading to his entrance into Gilead Bible College located at South Lansing, New York, in which he had been pre-enrolled. He further stated that his occupation was "The Full Time Ministry—Pioneering for Jehovah God"; that he advertised magazines of the Society on street corners; that he was conductor of the Theocratic Ministry School in his congregation and was also Area Company Bible Study Conductor; that he worked an average of 90 hours per week; that he was also engaged as a part-time handy man and that his prior experience was stock boy, painter, and handy man. He had completed almost two years of high school and had taken courses in analysis and study of the Bible in the Theocratic Ministry School, Watchtower Study and Company Bible Study.

In his questionnaire Hurt requested the board to furnish him the special form for conscientious objectors and further stated that in his opinion his classification should be in Class IV–D, the classification for a minister. In an accompanying letter the Company Servant of the Asbury Park Company (West Side Unit) of Jehovah's Witnesses of which Hurt was then a member stated that he was then serving as Study Conductor and School Servant. Also accompanying the questionnaire was a certificate of the Watchtower Bible and Tract Society that Hurt was appointed as a pioneer minister on July 1, 1951 "and acts as a direct representative of this organization and has since been organizing and establishing churches and generally

---

1. 50 U.S.C.A.Appendix, § 451 et seq.

preaching the doctrines and principles of Jehovah's witnesses in a territory assigned to him." The certificate further stated that he "is authorized to perform the ordinary rites and ceremonies recognized and employed by Jehovah's witnesses, such as the baptismal ceremony, the burial ceremony, etc."

The questionnaire and accompanying statements concerning Hurt's ministry were received by the board on December 4, 1951. The next day the board mailed Hurt the conscientious objector form, which was returned to the board completed on December 11, 1951. In the conscientious objector form Hurt also gave a chronological list of his jobs, showing work as dishwasher and busboy during the summers of 1947, 1948 and 1950, respectively, and that from 1951 "onward" he was employed by the Watchtower Bible and Tract Society of Brooklyn, New York, engaged in "Missionary Work or pioneering (Full time Servant)". On December 26, 1951 the board received a letter from Hurt requesting that his file be forwarded to Local Board No. 44 at Cambridge, Maryland, for classification. He informed the board that the Society in Brooklyn had chosen him "to go on a full time mission" in Cambridge "That is, preaching in the capacity as a pioneer or servant", and stated that due to his distance from Local Board No. 33 he would be put to a hardship to travel back from Maryland. No action appears to have been taken on this request. The board classified Hurt in Class I–A on February 4, 1952, notifying him by mail on the following day.

On February 12, 1952 the board received a letter from Hurt in which he objected to his classification and requested a personal hearing or a transfer to Local Board No. 44, again stating that he was a full-time minister entitled to classification in Class IV–D. On February 25, 1952 the board reviewed Hurt's file and recommended that his file should not be transferred to Maryland for hearing. He was advised that he would be granted a personal hearing on March 10, 1952, and that his classification in Class

I–A was continued. After the hearing on March 10th the board entered the following summary:

"He states he is one of Jehovah's Witness and an ordained minister. Wishes a 4 D class. 18 years old. Born in Neptune. Now lives in Md. 2 years H.Sch. Works in Cambridge Md. as minister, a pioneer, putting in 100 hrs. of field work. No pay for ministry. Sells literature to pay expenses, including personal & upkeep of automobile. He left school to go into the ministry feeling was the most important thing for him to do."

But the local board continued the I–A classification and so notified Hurt. He appealed and his file was sent for review to the Appeal Board for New Jersey. The case was referred to the Department of Justice for investigation, hearing, and recommendation on the conscientious objector claim. A Special Assistant Attorney General informed the Appeal Board on March 16, 1953, inter alia, as follows:

" * * * He devotes all of his efforts to the 'ministerial' duties of a Jehovah's Witness. He was baptized in this faith in 1946 and has been active ever since * * *

" * * * He is a 'Pioneer' minister in the organization and also a 'Company Servant.' Former acquaintances considered him to be very religious and sincere in his beliefs. Registrant and his family are somewhat 'fanatic' concerning their religion, but there is no doubt of registrant's good faith. Present neighbors advise that he is 'above average' in conduct and appears very earnest in the furtherance of his religious work. His associates are all Jehovah's Witnesses and he spends all of his time contacting prospective church members.

"The Hearing Officer noted registrant's religious activity over a period of seven years and recalled the various positions which he held in the Jehovah's Witnesses organiza-

tion. \* \* \* The Federal Bureau of Investigation report was reviewed which established registrant's excellent character and reputation. The Hearing Officer concluded that he was conscientiously opposed to combatant and noncombatant duty by reason of religious training and belief. Accordingly, he recommended a I–O classification.

"After consideration of the entire file and record, the Department of Justice finds that the registrant's objections are sustained as to both combatant and noncombatant training and service. It is, therefore, recommended to your Board that the registrant be classified in Class I–Q."

Hurt was placed in Class I–O as a conscientious objector by the Appeal Board, and on April 14, 1953 was informed of the change in his classification. He was requested to submit three types of approved civilian work which he was qualified to perform. Hurt advised the board that he was qualified to perform services as a minister, naming as his choice of employer the Watchtower Bible and Tract Society. However, the board advised him that the Society was not among those approved for such employment by Selective Service National Headquarters. On June 15, 1953 Hurt entered voluntarily upon civilian work as an attendant at the Marlboro State Hospital at Marlboro, New Jersey,[2] but he left that employment on July 31, 1953 and refused to take any other. He was declared delinquent and was indicted for failing, in violation of the Universal Military and Training Act, to accept alternative civilian work for a period of 24 months in lieu of induction into the armed forces of the United States. A trial was had to the court, a jury trial having been waived.

At his trial Hurt testified that at his personal hearing before the board he had stated that he was an ordained minister devoting full time to ministry in Cambridge, Maryland, that he "was presiding over congregation services," that his "only employment was that of a full time minister," and that he "lived merely from the contributions left through friends and through the landlord", to whom he paid "a dollar a week for taking care of the board and room". The trial judge found that the record before the board sustained its decision that Hurt was not entitled to classification as a minister. A motion on behalf of Hurt for a judgment of acquittal was denied and he was convicted by the district court. This appeal followed.

Hurt contends on this appeal that the denial by the Selective Service authorities of his claim for exemption as a minister of religion was without basis in fact in the record, that accordingly his classification was arbitrary, capricious and invalid and that his conviction, therefore, cannot stand. We think that these contentions must be sustained.

Section 6(g) of the Universal Military Training and Service Act provides that regular or duly ordained ministers of religion, as defined in the Act, "shall be exempt from training and service."[3] It will be seen that this language is mandatory, the exemption of ministers who come within the definitions being of right. The section is, as our brethren of the Fifth Circuit have described it, "a statute of religious liberty."[4] Paragraphs (1), (2) and (3) of section 16(g) of the Act supply the definitions referred to, as follows:

"(1) The term 'duly ordained minister of religion' means a person who has been ordained, in accordance with the ceremonial, ritual, or discipline of a church, religious sect, or

2. On June 22, 1953 the board issued an order directing Hurt to continue in such employment for 24 months.

3. 50 U.S.C.A.Appendix, § 456(g).

4. Chief Judge Hutcheson in Olvera v. United States, 5 Cir., 1955, 223 F.2d 880, 883.

organization established on the basis of a community of faith and belief, doctrines and practices of a religious character, to preach and to teach the doctrines of such church, sect, or organization and to administer the rites and ceremonies thereof in public worship, and who as his regular and customary vocation preaches and teaches the principles of religion and administers the ordinances of public worship as embodied in the creed or principles of such church, sect, or organization.

"(2) The term 'regular minister of religion' means one who as his customary vocation preaches and teaches the principles of religion of a church, a religious sect, or organization of which he is a member, without having been formally ordained as a minister of religion, and who is recognized by such church, sect, or organization as a regular minister.

"(3) The term 'regular or duly ordained minister of religion' does not include a person who irregularly or incidentally preaches and teaches the principles of religion of a church, religious sect, or organization and does not include any person who may have been duly ordained a minister in accordance with the ceremonial, rite, or discipline of a church, religious sect or organization, but who does not regularly, as a vocation, teach and preach the principles of religion and administer the ordinances of public worship as embodied in the creed or principles of his church, sect, or organization."[5]

■ It will be observed from these definitions that a "duly ordained minister of religion" is one who has been ordained in accordance with the discipline of his religious organization to preach and teach its doctrines and administer its rites and ceremonies in public worship *and who does so as his regular and customary vocation*. The statutory def-inition does not bring within the exemption a minister, even though duly ordained, whose preaching and teaching is irregular or incidental to other work and who does not regularly, as a vocation, teach and preach the principles of his religion and administer the ordinances of public worship as embodied in the principles of his religious organization. But if such ministry is the registrant's main and primary calling at which he works regularly, the vocation upon which his life is centered, he is within the statutory exemption even though he may engage in other part-time activities to help provide for his subsistence.

In Dickinson v. United States, 1953, 346 U.S. 389, at pages 394–396, 74 S.Ct. 152, at pages 156, 157, 98 L.Ed. 132, a case which also involved a claim by a "pioneer" minister of Jehovah's Witnesses for the ministerial exemption, the Supreme Court said:

"The ministerial exemption, as was pointed out in the Senate Report accompanying the 1948 Act, 'is a narrow one, intended for the leaders of the various religious faiths and not for the members generally.' S.Rep. No. 1268, 80th Cong., 2d Sess. 13. Certainly all members of a religious organization or sect are not entitled to the exemption by reason of their membership, even though in their belief each is a minister. Cf. Cox v. United States, 1947, 332 U.S 442, 68 S.Ct. 115, 92 L.Ed. 59. On the other hand, a legitimate minister cannot be, for the purposes of the Act, unfrocked simply because all the members of his sect base an exemption claim on the dogma of its faith. That would leave a congregation without a cleric. Each registrant must satisfy the Act's rigid criteria for the exemption. Preaching and teaching the principles of one's sect, if performed part-time or half-time, occasionally or irregularly, are in-

5. 50 U.S.C.A.Appendix, § 466(g) (1), (2) and (3).

sufficient to bring a registrant under § 6(g). These activities must be regularly performed. They must, as the statute reads, comprise the registrant's 'vocation.' And since the ministerial exemption is a matter of legislative grace, the selective service registrant bears the burden of clearly establishing a right to the exemption.

"We think Dickinson made out a case which meets the statutory criteria. He was ordained in accordance with the ritual of his sect and, according to the evidence here, he meets the vital test of regularly, as a vocation, teaching and preaching the principles of his sect and conducting public worship in the tradition of his religion. That the ordination, doctrines, or manner of preaching that his sect employs diverge from the orthodox and traditional is no concern of ours; of course the statute does not purport to impose a test of orthodoxy.

"Why, then, was Dickinson denied IV–D? It may be argued that his five hours a week as a radio repairman supplied a factual basis for the denial. We think not. The statutory definition of a 'regular or duly ordained minister' does not preclude all secular employment. Many preachers, including those in the more traditional and orthodox sects, may not be blessed with congregations or parishes capable of paying them a living wage. A statutory ban on all secular work would mete out draft exemptions with an uneven hand, to the detriment of those who minister to the poor and thus need some secular work in order to survive. To hold that one who supports himself by five hours of secular work each week may thereby lose an ex-

emption to which he is otherwise entitled, would be to achieve a result that Congress so wisely avoided."

In the light of the statute as thus construed and applied by the Supreme Court we have reviewed the record in the case before us and we find nothing in it to support the denial of Hurt's claim for exemption as a duly ordained minister of religion. Nothing whatever appears to controvert the statement made by the Special Assistant to the Attorney General in March 1953 after reviewing the F.B.I. investigation of Hurt that he "devotes all of his efforts to the 'ministerial' duties of a Jehovah's Witness" and that he is "a 'Pioneer' minister in the organization and also a 'Company Servant.'" The district court thought that the Selective Service authorities were justified in rejecting Hurt's exemption claim because he was originally ordained in 1946 at the age of 13 and because he did not complete his high school studies. But the court overlooked the fact that in the organization of Jehovah's witnesses all adherents are ordained as ministers when they are baptized because the organization calls upon all its members to preach the doctrine and principles of their fath. When this is done as a part-time activity by a member who has another vocation he is, of course, not entitled to the ministerial exemption. But when it becomes his primary and principal vocation the criteria laid down in the statute have been satisfied and he is entitled to the exemption even though incidentally he also engages in subsistence activities.

The Selective Service authorities have recognized that in the organization of Jehovah's Witnesses those members designated as "pioneers" ordinarily devote all or substantially all of their time to the dissemination of their tenets and beliefs.[6] Of course it is always possible

6. In an Advice to State Directors of the Selective Service System regarding the ministerial status of certain officials of certain religious organizations Director Hershey stated: "Pioneers of Jehovah's Witnesses are those members of Jehovah's Witnesses who devote all or substantially all of their time to the dissemination of the tenets and beliefs of Jehovah's Witnesses." State Director Advice (No. 213–B), issued June 7, 1944, National Headquarters, Selective Service System.

that a "pioneer" of Jehovah's Witnesses might not take up the ministry as his vocation and principal occupation [7] or might abandon it after he had taken it up, just as sometimes happens with an ordained minister of a more orthodox church. It is still necessary in each case of a "pioneer", as in the case of any other minister, for the board to ascertain that he is carrying on the ministry as his primary and principal vocation before granting the ministerial exemption.[8] It is in this purely factual respect that this case differs from United States v. Hagaman, 3 Cir., 1954, 213 F.2d 86. In that case this court found support in the record for the board's conclusion that Hagaman, although a "pioneer" had not made the ministry his principal vocation. His conviction was reversed, however, because of a procedural error by the Selective Service authorities. This necessitated his subsequent reclassification upon which, as we were informed at bar, he was granted the ministerial exemption, evidently having satisfied the board that at that time he had taken up the pioneer ministry as a full-time vocation.

Nor do we think the fact significant that Hurt did not finish high school. The Act does not impose upon ministers a test of scholarship. Some of the greatest ministers of religion, including the apostles of Jesus Christ, were unlettered men. Moreover all the material in the record in Hurt's case compels the conclusion that in 1953, when he was finally classified, his full-time work in the ministry was being devoted not only to carrying on activities of an evangelistic nature and conducting Bible studies but also to further preparing himself by study for better carrying on this work. The fact that he was devoting an average of 90 hours a week to all these activities indicates how fully he had made them his vocation in life.

Since the action of the local board in denying Hurt's claim for ministerial exemption had no basis in the facts before the board it may well have been founded upon suspicion and speculation. "But," as the Supreme Court said in Dickinson v. United States, 1953, 346 U.S. 389, 397, 74 S.Ct. 152, 158, 98 L.Ed. 132, "when the uncontroverted evidence supporting a registrant's claim places him prima facie within the statutory exemption, dismissal of the claim solely on the basis of suspicion and speculation is both contrary to the spirit of the Act and foreign to our concepts of justice."

The problems presented by these cases involving "pioneer" ministers of Jehovah's Witnesses are cogently summarized in the opinion recently filed by Chief Judge Hutcheson in Pate v. United States, 5 Cir., 1957, 243 F.2d 99, 102, a case very similar to this, in which he said:

" * * * What is presented in this case is the same phenomenon which has been presented in many other cases of this kind. This is that, even though the defendant is a full time and pioneer minister of Jehovah's Witnesses, the general attitude of the board and the public toward these claims is hostile and unbelieving, and, instead of applying the law as written to the facts as testified to, the board in effect rewrites the law to require duties and conditions which the law does not require. Therefore, here, in addition to the non-existence in the record of evidence to rebut the defendant's prima facie case, there are the further undisputed facts that the draft boards employed standards applicable to ministers of orthodox

---

7. Compare United States v. Diercks, 7 Cir., 1955, 223 F.2d 12, certiorari denied 350 U.S. 841, 76 S.Ct. 81, 100 L. Ed. 750.

8. Thus in the Advice to State Directors quoted in note 6, supra, Director Hershey said:

"Whether a registrant who qualifies under the statements hereinbefore made, is actually engaged in the regular discharge of his duties as a regular or duly ordained minister of religion must be determined in each individual case by the local board or agency of appeal."

churches instead of those standards fixed in the law and applicable here, and thus erroneously held: that part time secular work, from which defendant earned all his livelihood, defeated the ministerial claim; and that, because he did not earn any part of his livelihood from his ministry, he could not be regarded as a minister.

"As appellant correctly declares in his brief, the real trouble here is, as it has been in many other cases, that the local board has tried to fit and mold an ordained pioneer minister of Jehovah's Witnesses into the orthodox straightjacket of ministers of an orthodox church, in the face of the fact that it is impossible to fit the garments of orthodoxy on a pioneer minister of Jehovah's Witnesses, and that by their footless effort to do so, the local board erred to the prejudice of defendant and to the denial of rights accorded him by the act and regulations.

"*Nowhere in them is there a requirement that a minister earn his livelihood from the ministry or from a particular congregation, or that he have a pulpit before he can claim and receive classification as a minister.* All that the act and regulations require in order for one to qualify as a minister and to receive the classification is that the ministry be his vocation, not an incidental thing in his life. Sec. 16(g) (1) (2) (3), Universal Military Training and Service Act, 50 U.S.C.A.Appendix, § 466(g) (1–3). Once he makes such a showing, as undeniably defendant did in this case, then he is entitled, not as a matter of grace but as a matter of right to the statutory exemption and the classification sought."

Upon the authority of Dickinson **v.** United States, 1953, 346 U.S. 389, 74

S.Ct. 152, 98 L.Ed. 132, with which we think this case is indistinguishable in principle, and in consonance with the recent cases in other courts of appeals involving the ministerial exemption of "pioneer" ministers of Jehovah's Witnesses [9] we hold that the denial of Hurt's claim for ministerial exemption was without any basis in fact and that his classification in Class I–O was therefore invalid and so did not furnish support for the judgment of conviction.

The judgment of the district court will be reversed and the cause will be remanded with directions to enter a judgment of acquittal.

---

**9.** Hacker v. United States, 9 Cir., 1954, 215 F.2d 575; Brown v. United States, 9 Cir., 1954, 216 F.2d 258; United States v. Ransom, 7 Cir., 1955, 233 F.2d 15; Rowell v. United States, 5 Cir., 1955, 233 F.2d 863; Pate v. United States, 5 Cir., 1957, 243 F.2d 99.