**UNITED STATES**

v.

**Leslie Bernard TETTENBURN.**

**Crim. A. No. 24880.**

United States District Court
D. Maryland.
July 22, 1960.

**204**

Leon H. A. Pierson, U. S. Atty., and William J. Evans, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Joel H. Pachino, Baltimore, Md., for defendant.

R. DORSEY WATKINS, District Judge.

The defendant is charged in a one-count indictment with knowingly having failed, neglected and refused to obey an order of Local Board No. 7 to report to Crownsville State Hospital, Crownsville, Maryland on April 20, 1959, where he had been assigned to do civilian work contributing to the maintenance of the national health, safety or interest in lieu of induction.

### Facts

Upon trial of the case by the court defendant's Selective Service file was offered in evidence. It shows that defendant registered with the Selective Service System on August 2, 1954, and that in the Selective Service System Classification Questionnaire, filed with the Local Board on February 27, 1956, he stated that he was an ordained minister of religion, regularly serving as such as a member of the Watchtower Bible and Tract Society. Simultaneously submitted by the defendant with the questionnaire "as proof of my ministry" was a tract quoting extensively from the Supreme Court Dickinson decision (Dickinson v. United States, 1953, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132) and setting forth what activities the Jehovah's Witnesses themselves claim warrant ministerial classification.[1] Defendant also advised the Board that he was a house painter and decorator but that he regarded this employment as occasional or temporary, being paid $11.00 per day and working an average of 25 hours per week. He also signed the statement that "By reason of religious training and belief I am conscientiously opposed to participation in war in any form * * *."

On March 7, 1956, the defendant filed with the Local Board his Special Form for Conscientious Objectors in which he said "I am by reason of my religious training and belief conscientiously opposed to participation in war in any form, and I am further conscientiously opposed to participation in non-combatant training and service in the armed forces. I therefore claim exemption for both combatant and non-combatant training and service in the armed forces" adding *unless* "my claim for exemption as a minister is sustained." Defendant was ordained as a "minister" of the Jehovah's Witnesses by water baptism in April 1945 at the age of eight years and received the training and acquired the belief which is the basis of his claim for conscientious objector classification in that from "the time I have been able to read I have been taught by my mother and other persons of my family and organization. Through texts (sic) books and the Bible I have studied, myself and acquired the belief which is the basis of my claim. The texts (sic) books which I study, I receive from the Watchtower Society." On May 1, 1956, defendant filed a duplicate Special Form for Conscientious Objectors, supplying certain additional information with statements from various members of his congregation. On May 10, 1956, the congregation servant, or presiding minister, of the North Unit of Jehovah's Witnesses, St. Petersburg, Florida, advised that the defendant was spending approximately 16 hours per week in religious work. On June 21, 1956, the defendant was classified 1-A by the Local Board by a vote of

---

1. This tract will be hereinafter referred to in some detail.

2 to 0; thereafter he was afforded a hearing before the Local Board and was retained in classification 1–A by the same vote. From this classification the defendant appealed. Since the claim to conscientious objector classification was in question, a Department of Justice review and inquiry was undertaken, as a result of which the Appeal Board classified the defendant 1–O by a vote of 4 to 0. The defendant reported for physical examination and was found fully acceptable for induction into the armed forces.

Thereafter, the defendant filed his special report for Class 1–O registrants with the Local Board in which he failed to submit his preference of three types of civilian work which he would be willing to perform in lieu of induction and subsequently advised the Local Board that he would not serve in a civilian service position "because this would interfere with my ministry." After further attempts by the Local Board to secure the defendant's preferences with regard to civilian work, a meeting was scheduled, its purpose being to discuss with the defendant the various places and types of work which he might select for his alternative service. The defendant advised the Local Board that he would be unable to attend the meeting since he was then living in Florida and had insufficient funds to come to Baltimore. At the same time he submitted, at the Board's request, information to the effect that he was a blockmason employed 35 hours per week at $3 per hour, that his income from secular employment during the previous twelve months had been $5,300 and that he spent 83 hours a month in religious work, 15 hours of which he credited to field work. The scheduled meeting was held although the defendant did not appear. A memorandum of that meeting states "Local Board members determined that evidence presented in registrant's letters of January 2, 27, and 28, 1959, and February 4, 1959, did not warrant reopening of his classification." The registrant was informed of this action by letter on the same day of the meeting. Defendant was ordered to report to his Local Board to be assigned to hospital work. He reported to his Local Board as directed, but at that time advised that he would not accept the assignment, and he did not appear at Crownsville State Hospital as ordered. The present indictment followed as a consequence.

### Question Presented

Defendant concedes that he so failed to report but contends that he made a prima facie showing of his being entitled to IV–D classification, so that the Board's denial of a ministerial exemption was without any "basis in fact" and thus constituted a denial of due process under the 5th Amendment to the Constitution of the United States.

### Discussion

In the case of Blalock v. United States, 1957, 247 F.2d 615, 619, the Court of Appeals for the Fourth Circuit said:

"In a prosecution for refusing to submit to induction, *the scope of judicial inquiry into the administrative proceedings leading to the defendant's classification is very limited. The range of review is the narrowest known to the law.* Campbell v. United States, 4 Cir., 221 F.2d 454. The 'clearly erroneous' rule applied in equity appeals has no place here, nor even the 'substantial evidence' rule of the Administrative Procedure Act, 5 U.S.C.A. § 1009. Congress gave the *courts* no general authority of revision over draft board proceedings, and we *have authority to reverse only* if there is a denial of basic procedural fairness or *if the conclusion of the Board is without any basis in fact.* Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428; Goff v. United States, 4 Cir., 135 F.2d 610."

(Emphasis supplied.)

Applying this principle to the case in point, the court finds no merit to defendant's contention that the Local Board's denial to him of a ministerial classification was without any basis in fact.

The defense relies heavily, if not entirely, upon the case of *Wiggins* v.

United States, 5 Cir., 1958, 261 F.2d 113, certiorari denied 1959, 359 U.S. 942, 79 S.Ct. 723, 3 L.Ed.2d 676, rehearing denied 1959, 359 U.S. 976, 79 S.Ct. 874, 3 L.Ed.2d 843, in which a Book Study Conductor of the Jehovah's Witnesses (the same position held by this defendant) who was employed "full-time" in secular work was declared to be a minister. Wiggins spent about 38 hours per month in religious work and 40 hours per week in secular employment whereas the instant defendant claimed in January 1959, when he requested a "reconsideration" of his classification, 83 hours per month in religious work, 15 of which he credited to field work, as opposed to 35 hours per week in secular employment.

The Court of Appeals for the Fifth Circuit in deciding the Wiggins case stated that the position of a book study conductor is "roughly analogous to that of an assistant minister or assistant pastor. It involves regular duties chiefly in regard to instructing in the Bible, conducting Bible study classes, preaching on street corners and on house to house calls, and training others in the work" (261 F.2d at page 118). Thus having concluded that Wiggins was in fact a minister, the court went on in effect, as this court reads the decision, to disregard the statutory requirement that a regular or duly ordained minister does not include a person who does not regularly as a vocation teach and preach the principles of his religion, the Fifth Circuit stating that the "time spent in secular employment as against the time spent regularly in religious activities is an important factor in deciding whether a man is entitled to an exemption as a minister. It is not the sole or necessarily conducive factor. Some allowance must be made for ministers who are gainfully employed simply because they are not paid for their religious ministry. If they must work, they should not be penalized for working steadily. A young man such as Wiggins could hardly work less than forty hours a week as crane operator and hold on to his job." (261 F.2d at page 119). The court seemingly did not consider it of any significance that the time spent by Wiggins in performing his religious duties, *two-thirds* of which time was devoted to "biblical research and study" and "reading summary material", totalled in all approximately one and one-third hours a day.

This court must respectfully decline to follow the Wiggins decision for three reasons. First, it does not agree with the holding of the Court of Appeals for the Fifth Circuit that the position of a book study conductor is roughly analogous to that of an assistant minister or assistant pastor; secondly, as previously stated, it appears to this court that the statutory requirement for exemption as a minister that one teach and preach as his regular and customary vocation was not met in the Wiggins case; and thirdly, the relevance of the type of religious duties engaged in as to the issue of whether or not they constituted "teaching and preaching" was not considered.

The defendant in the instant case, like Wiggins, is a book study conductor. However, from information appearing in official publications of Jehovah's Witnesses, and from statements made by their general counsel, Hayden C. Covington, Esquire, particularly a "Memorandum to National Selective Service Appeal Board Answering Questions Regarding Jehovah's Witnesses", a certified copy of which was offered in evidence at the trial of this case, this court holds that in the absence of engaging in full time ministry, a book study conductor is not a minister entitled to exemption either within the meaning of the Universal Military Training and Service Act of 1948, as amended (50 U.S.C.A.Appendix, § 466[g]) [2] or within the understanding

2. Section 16(g) of the Universal Military Training and Service Act of 1948, as amended (50 U.S.C.A.Appendix, § 466 [g]) defines ministers of religion as follows:

"(1) The term 'duly ordained minister of religion' means a person who has been ordained, in accordance with the ceremonial, ritual, or discipline of a church, religious sect, or organization established

of the Jehovah's Witnesses of their position under the Act.

The Watchtower Society has a field division which maintains liaison between the international headquarters and the local congregations. Each congregation is headed by a Congregation Servant who is the presiding minister and overseer of all congregation activities. Under the Congregation Servant there are as many as seven Servants in Congregation. It is most important that the title "Servant in Congregation" be distinguished from "Congregation Servant". There is but one Congregation Servant and he is the presiding minister. Among the Servants in Congregation are an Assistant Congregation Servant who takes oversight of the congregation in the absence of the Congregation Servant, and a Bible Study Servant who supervises the Bible study work and back-call activity of the congre-

gation. The Congregation Servant, Assistant Congregation Servant, and Bible Study Servant comprise what is known as the Congregation Committee. This Committee makes recommendations as to the appointment of Servants and is active in fiscal and other matters. There are other Servants in Congregation; and in smaller congregations, one person may hold more than one position.

Each congregation contains a number of Pioneer ministers, some of whom may hold positions as a Servant in Congregation. There are 6,602 Pioneers in the United States. The Pioneer works under the supervision of the Congregation Servant but is appointed by and required to submit monthly reports to the international office in Brooklyn. *He must devote an average of 100 hours a month to ministerial activities in the field. In computing his 100 hours per month he is not*

---

on the basis of a community of faith and belief, doctrines and practices of a religious character, to preach and to teach the doctrines of such church, sect, or organization and to administer the rites and ceremonies thereof in public worship, and who *as his regular and customary vocation preaches and teaches* the principles of religion and administers the ordinances of public worship as embodied in the creed or principles of such church, sect, or organization.

"(2) The term 'regular minister of religion' means one who *as his customary vocation preaches and teaches* the principles of religion of a church, a religious sect, or organization of which he is a member, without having been formally ordained as a minister of religion, and who is recognized by such church, sect, or organization as a regular minister.

"(3) The term 'regular or duly ordained minister of religion' *does not include a person who irregularly or incidentally preaches and teaches* the principles of religion of a church, religious sect, or organization and does not include any person who may have been duly ordained a minister in accordance with the ceremonial, rite, or discipline of a church, religious sect, or organization, but *who does not regularly, as a vocation, teach and preach* the principles of religion and administer the ordinances of public worship as embodied in the creed or principles of his church,

sect, or organization." (Emphasis supplied.)

See also: Senate Report No. 1268, 80th Congress, Second Session, dated May 12, 1948, stating on page 13:

"(g) Deferment of ministers and ministerial status.—Regular or duly ordained ministers of religion, and certain theological and pre-theological students, are exempted from induction but not registration. This sub-section parallels the 1940 Act, except as regards pre-theological students, who were not covered in the original statute. Serious difficulties arose in the administration and enforcement of the 1940 Act because of the claims of members of one particular faith that all of its members were ministers of religion. A minority of the Supreme Court thought that Congress intended to grant an exemption broad enough to include this group. (See the dissenting opinions in Cox v. United States, 332 U.S. 442, 455, 457, [68 S.Ct. 115, 92 L.Ed. 59]). In order that there may be no misunderstanding of the fact that the exemption granted is a narrow one, intended for the leaders of the various religious faiths and not for the members generally, the terms 'regular or duly ordained ministers of religion' have been defined in Section 16(g). The definition is that which was contained in the 1917 Selective Service Regulations and which was successfully administered without the problems which arose under the 1940 act."

*allowed to count time spent in reading or preparation for field work.* Vacation Pioneers are appointed for a two-week to three-month period and are not regarded as regularly appointed, full Pioneers.

In addition to the Servants in Congregation and the Pioneers, there are Book Study Conductors who with the aid of the Society's bound books preside over study groups engaged in Bible study. There can be as many Book Study Conductors as the congregation deems appropriate and there are now 13,830 of them in the United States. This is an average of more than three for each congregation. A Book Study Conductor need not be, and usually is not, a Pioneer minister and, therefore, has no minimum requirement as to hours he devotes to religious work. *The title of Book Study Conductor is the lowest title given in a local congregation,* all other members being known as Publishers. Servants in Congregation, Pioneers, and Book Study Conductors are sometimes referred to by the Society as "Assistant Presiding Ministers." This is on the theory that each one is of some assistance to the Congregation Servant, but the designation "Assistant Presiding Minister" must be distinguished from "Assistant Congregation Servant", since there is only one "Assistant Congregation Servant" but an average of more than ten "Assistant Presiding Ministers" in a local congregation.

Hayden C. Covington, General Counsel of Jehovah's Witnesses, after considering the congressional intent and decisions of the Courts prior to the Wiggins case, concluded and advised the Presidential Appeal Board that ministerial exemption would not be claimed for those below the rank of Pioneer, except in the case of Congregation Servants, and that ministerial exemption would not even be claimed for all Congregation Servants. It was his position that a Congregation Servant would have to engage in some *field ministry* in addition to his duties as Congregation Servant in order to claim the ministry as his customary vocation. Mr. Covington's "Memorandum to National Selective Service Appeal Board Answering Questions re: Jehovah's Witnesses" (Government's Exhibit 2 in the instant case) states the Watchtower Bible and Tract Society's position as to ministerial exemptions for its congregation servants, who it should be noted are in fact the local congregations' presiding ministers, as follows:

"14. Does the Watchtower Bible & Tract Society claim ministerial exemption for all Congregation Servants?

"The Society does not claim exemption for congregation servants under the present law, except for those who are also pioneers or congregation servants (not pioneers) who can show that they are devoting their time to the ministry work of Jehovah's Witnesses sufficiently to claim that it is their vocation rather than their avocation. While the time of the congregation servant devoted to his duties is substantial it does not alone constitute his vocation. [See Preaching Together In Unity, page 29]. *To qualify for exemption under the present law the congregation servant must show that he is devoting enough hours to the field ministry work of Jehovah's Witnesses, in addition to his duties as a congregation servant, to constitute it as his vocation.*[3] He can do this even though he may not be a pioneer providing he devotes a substantial portion of his time to the ministry and shepherding the flock of God."

\* \* \* \* \* \*

"19. Will the Society agree that it will not press for ministerial status for anyone under the rank of pioneer?

"Yes, except in the case of the congregation servant who is devoting a substantial amount of his time, not as a pioneer, which together with

---

3. Emphasis supplied.

his duties as a congregation servant makes his ministry his vocation and not his avocation. The Society is interested in defending only those persons who qualify for the exemption under the law of the land. On such basis it does not contend that every minister in the organization is entitled to the exemption. Only those ministers who meet the definition of vocation required by the statute are entitled to be given the exemption and these the Society can legally defend."

As to exemptions for pioneers:

"The Society does claim exemption under the Universal Military Training and Service Act for all male pioneers who are annually devoting the required time of 1200 hours to the specified preaching work."

As to the difference between time spent in preparing for the ministry and that spent in actual field ministry:

" * * * It should be observed that while travel time, study time and attendance at meetings are all in the furtherance of the ministry, in the case of pioneers as with all of Jehovah's Witnesses, such time is not reported in the 1200 hour annual minimum quota of preaching in the missionary field."

That Jehovah's Witnesses themselves make full time missionary field preaching the test of the right to a ministerial exemption is likewise evidenced by the tract previously referred to as being submitted by the defendant himself together with his original Selective Service System Classification Questionnaire on February 27, 1956. It states, in pertinent part:

* * * * * *

"Recently in a district court in Boston Judge Wyzanski in the Millett case held that he was a minister although he devoted four and a half hours daily to nonministerial activity. *Nor was he a servant in a congregation. But he was a pioneer minister devoting a hundred hours a month to missionary preaching,* and exempt under the law, in harmony with the findings of the Supreme Court in the Dickinson case.

"Other decisions have come in as a result of the victory in the Supreme Court, and doubtless the stream of victories will continue. Jehovah's witnesses are pleased that there are yet many judges in the land that see the justice of their cases, and they give praise and thanks to Jehovah for the victories *that make it possible for full-time ministers to continue serving without interruption.*

"Jehovah's witnesses see their position clearly, under the terms of the Selective Service Act. According to the Act those who follow the ministry as their vocation are exempt. If they are pioneer ministers of the organization putting in a hundred hours a month preaching, they merit exemption. How they are ordained and how they preach are of no concern to boards or courts or government. The performance of some secular work to defray expenses does not nullify their claim. *It is not the holding of a servant position in a congregation that will bring exemption, but following the ministry as one's vocation, as a pioneer. Part-time ministers, congregation publishers, are not benefited by this decision. It is the full-time minister* that has assurance that his ministerial activity will be uninterrupted, * * *" ("Awake", issue of March 22, 1954, page 14—Emphasis supplied).

Upon an examination of defendant's Selective Service file the court finds the following basis in fact for the Local Board's conclusion that the defendant was not entitled to a ministerial classification. In August of 1956 the defendant was engaged in secular work as a house painter twenty-four hours a week, earning $1208 a year and devoting 100 hours per month to preaching and teaching. He ceased his ministry as a full-time

pioneer about January 1, 1957 and took employment as a general mason earning approximately $5,300 a year but stated he expected to resume full-time ministry by August or September 1957. This expectation was never fulfilled. He continued in his employment as a mason and in January 1959 when "reconsideration" of his status was requested by him and in February 1959 when his present classification was made final, he was working thirty-five hours a week at $3 an hour as a block mason, having earned $5,300 in the previous twelve months. He claimed eighty-three hours a month devoted to religious duties. An analysis of these duties reveals that time for morning prayers, personal study, attending meetings and traveling were included in the total calculation, only fifteen hours a month being spent in field ministry. Defendant's answer to question No. 12 propounded by the Local Board is as follows and constitutes a recognition by the defendant himself that he was not, within the tenets of his own faith, engaged in full-time ministry.

"12.—Question: Are your objections based primarily upon your desire to preach or upon your unwillingness to use force?

"Answer: My objections are based on Bible principles, which I have studied thoroughly and sincerely believe in. These Bible principles *inspire me to have the desire to preach and teach the laws of Jehovah. This desire is shown by the love of my fellowman.*

"To further my desire I have made definite plans *to re-enter the full-time ministry* August 1, 1959." [4] (Emphasis supplied).

Thus the record evidences a substantial attrition in preaching and teaching activities accompanied by a substantial increase in secular employment together with a recognition by the defendant himself that the ministry did not constitute his vocation. Under the Fourth Circuit holding in Manke v. United States, 1958, 259 F.2d 518, 521, this evidence would suffice to constitute a basis in fact for the denial by the Local Board of defendant's claim to a ministerial exemption as the court therein stated "we find no merit in appellant's contention that the denial of ministerial * * * classification by the Appeal Board was without basis in fact. Ministerial classification might have been and evidently was denied chiefly because of the comparatively little time which appellant spent about his work as a 'Pioneer' for Jehovah's Witnesses and the relatively long hours which he spent during the same period in secular work. Cf. Dickinson v. United States, 1953, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132; * * *" In view of the court's reference to the Dickinson case, it is interesting to compare factually the present defendant's religious activities with those of the petitioner in the Dickinson case as such activities were summarized by the Supreme Court:

"In the Spring of 1949 Dickinson voluntarily left his 40-hour-a-week job as a radio repairman and was baptized, the mark of ordination of Jehovah's Witnesses. In August 1949 he was enrolled by national headquarters of the Watchtower Bible and Tract Society and began his work as a full-time 'pioneer' minister, *devoting 150 hours each month to religious efforts.* This shift in Dickinson's activities occurred after February 1949 when selection under the Act was at a standstill, regular inductions having been halted. As of January 1950 Dickinson changed his residence in order to assume the role of 'Company Servant' or presiding minister

---

4. In July 1958, the defendant married. His wife is also a Jehovah's Witness. Her father was defendant's employer during the entire period from January 1956 to February 1959, the date of defendant's final classification. Due to these circumstances, one might well assume that defendant's twice announced plans to resume full-time ministry could well have been accomplished if made in good faith.

of the Coalinga, California, 'Company,' which encompassed a 5,400-square-mile area. At that time *he dedicated approximately 100 hours each month to actual pioneer missionary work*—delivering public sermons, door-to-door preaching, conducting home Bible studies. In the remaining 50 hours devoted to religious activities each month, Dickinson studied, planned sermons and discourses, and wrote letters connected with his work. A substantial portion of this time was spent conducting three to four meetings each week of the 'Company' or congregation at a public hall in Coalinga. Dickinson arranged for and presided over these meetings, usually delivering discourses at them. He also instructed prospective ministers in the proper delivery of sermons at the 'Company's' Theocratic Ministry School. Dickinson received no salary for his missionary or company servant work. He lived on $35 a month earned by a weekly average of five hours of radio repair work. This modest income, a low $15–17.50 a month rental for an apartment, self-performance of household tasks, and invitations to various private homes enabled Dickinson to subsist." 346 U.S. at pages 392–393, 74 S.Ct. at page 155; emphasis supplied.

The Supreme Court then continued:

" * * * Each registrant must satisfy the Act's rigid criteria for the exemption. Preaching and teaching the principles of one's sect, if performed part-time or half time, occasionally or irregularly, are insufficient to bring a registrant under § 6(g). These activities must be regularly performed. They must, as the statute reads, comprise the registrant's 'vocation.' And since the ministerial exemption is a matter of legislative grace, the selective service registrant bears the burden of clearly establishing a right to the exemption.

"We think Dickinson made out a case which meets the statutory criteria." 346 U.S. at page 395, 74 S.Ct. at page 156.

Defendant's religious activities rather than being comparable to Dickinson's are instead strikingly similar to those of the appellant in the Leitner case and bring this case within the ambit of that decision wherein the Court of Appeals for the Fourth Circuit stated:

\* \* \* \* \* \*

"Appellant, who was a carpenter by trade, *claimed* to be a minister of religion of the sect known as Jehovah's Witnesses and *to have become a minister of that sect when he was nine years of age*. There was evidence before the board, however, to the effect that he worked as a carpenter 45 hours a week and *devoted only 15 hours a month to religious work*. There was evidence also that appellant's brother was the 'company servant' or 'presiding minister' of the company of Jehovah's Witnesses of which appellant was a member and that *appellant was merely a* 'territory servant' and *'Bible study servant.'* The facts are fully set forth in the 'Memorandum of Facts and Authorities' filed by the trial judge and nothing need be added thereto. For reasons therein adequately stated, we agree with the trial judge that the order of the board denying appellant the classification of a minister of religion may not be condemned as arbitrary or unreasonable, or as lacking support in the record, or as denying appellant procedural or other rights." Leitner v. United States, 4 Cir., 1955, 222 F.2d 363, 364—emphasis supplied.

For the foregoing reasons this court finds no merit to defendant's contention that the Local Board's denial to him of a ministerial exemption was without *any basis in fact* but instead, if it were required to do so, would hold that the conclusion of the Local Board was supported not only by substantial evidence on the rec-

ord considered as a whole but also by a preponderance of the evidence.

This opinion embodies the general finding of fact and the specific findings of fact required upon request by Rule 23(c), F.R.Cr.P., 18 U.S.C.A. However, should counsel desire additional findings of fact, the court will entertain such a request.

See also 165 F.Supp. 660, 269 F.2d 317, certiorari denied 361 U.S. 883, 80 S.Ct. 154, 4 L.Ed.2d 119.