**UNITED STATES of America**

v.

**Paul Oscar POMPEY, Appellant.**

**No. 19385.**

United States Court of Appeals,
Third Circuit.

Argued Feb. 16, 1971.

Decided Aug. 3, 1971.

Freedman, Circuit Judge, participated in consideration of case but died before any disposition was made.

John David Egnal, Egnal & Egnal, Philadelphia, Pa., for appellant.

Richard M. Meltzer, Asst. U. S. Atty., Philadelphia, Pa. (Louis C. Bechtle, U. S. Atty., Philadelphia, Pa., on the brief), for appellee.

Before FREEDMAN,* SEITZ and ROSENN, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

Defendant, Paul Oscar Pompey, was convicted by the district court sitting without a jury of violating 50 U.S.C. App. § 462(a), in that he knowingly refused to obey the order of his local draft board to report for civilian work as a conscientious objector in lieu of induction into the Armed Forces. In this ap-

---

* Judge Freedman participated in the consideration of this case but died before any disposition was made.

peal, defendant challenges the validity of his I–O (conscientious objector) classification on the ground that his local board should have granted him a ministerial exemption instead.

At the time he registered with the Selective Service System in January 1966, defendant completed a "Classification Questionnaire" (SSS Form No. 100), in which he alleged that he was both a conscientious objector and a minister of Jehovah's Witnesses. Included in his Form 100 was the following statement: "I prefer a ministers clasifaction, but will acept a conscientious objator claim If I am not granted my right of a minister's classifaction." Defendant's local board classified him I–A but later did send him a special form for claiming conscientious objector status (SSS Form No. 150). Defendant not only outlined his religious beliefs on the Form 150 but also wrote that he was assistant presiding minister of his congregation and itemized the approximate number of hours per month spent in various religious activities. Although he stated that his preaching and teaching were performed "regularly and customarily * * * as a vocation," he indicated on this and various other Selective Service forms that his "usual occupation" was working as a stock boy at an average of 48 hours per week.

Defendant was classified as a conscientious objector on May 16, 1966. He immediately requested a personal appearance to discuss his entitlement to a IV–D exemption, "being that I am a duly ordained minister who regularly preaches and teaches not irregularly or incidentally do so." Upon receiving certification from the Watchtower Bible and Tract Society and from the Presiding Minister of his local congregation that defendant was a duly ordained minister functioning as a Book Study Conductor, the local board permitted defendant to appear before it on August 2, 1966. A summary of this hearing prepared by the clerk of the local board indicates: (a) that defendant claimed to have been an ordained min-

ister since the age of 15; (b) that he worked a minimum of 40 hours per week as a shirt-maker's helper; (c) that his church activities were primarily performed at night and on Sundays and included preaching, teaching, attending meetings, studying the Bible, going to Ministry School, and distributing religious pamphlets door-to-door; and (d) that he would not perform alternate service as a conscientious objector because "we are not permitted to serve anyone but God."

Based upon this interview and a review of the information already in defendant's file, the local board voted unanimously to retain defendant in Class I–O on the expressly stated ground that there was insufficient evidence to warrant a IV–D classification. This decision was subsequently upheld by the state appeal board on November 30, 1966. On January 9, 1967, the local board received a request from defendant for a further appeal, reiterating once again that he was recognized by the members of his congregation as an assistant presiding minister who "teaches as a vocation the doctrines and principles of the bible as advocated by Jehovah's Witness's." The board informed defendant that he could not take a second appeal from his I–O classification and asked him to complete a "Special Report for Class I–O Registrants" (SSS Form No. 152), on which a registrant must select three types of approved civilian work he would be willing to perform.

On September 8, 1967, having yet to select any acceptable civilian employment, defendant sent the following letter to his local board:

"I am writing the board to inform you of my change of address. My new address is

400 W. Charlton St.
Milledgeville, Ga.
31061

"My purpose for moving to Gaoriga is that there are fewer Jehovah's Witnesses there and my being a young

regular minister who engages in preaching and teaching the tenets and principles of Jehovah's Witnesses as a missionary Evangelist is are greatly needed."

The local board continued defendant's processing for civilian work and, since he had failed to select the type of work he wished to perform, the board mailed him a list of proposed jobs and asked him to select one within ten days. This list was inadvertently mailed to defendant's former Philadelphia address. On January 16, 1968, defendant responded in part as follows:

"I had informed you Spt. 8, 1967 that my resident was being changed to 400 W. Charlton St. Milledgeville Ga where I am serving as a pioneer Missionary Minister who is engaged in preaching and teaching the tenets of Jehovah Witness, a duly ordained minister having the qualifications to preach the Gospel of God's kingdom through Christ Jesus. Isa 61:1,2 Matt. 24:14. I am, by reason of my religious training and belief, conscientiously opposed to participation in war in any form and I am further conscientiously opposed to participation in noncombatant services. Due to conscien I am unabel to serve as a noncombant at any of the Hospitals you have listed."

Finally, on December 17, 1968, the State Director of the Selective Service System authorized the local board to order defendant to report for civilian work at Norristown State Hospital, Norristown, Pennsylvania, on the condition that the board should first determine whether a reopening would be warranted on the basis of new information which had not previously been considered. The board met again on January 9, 1969 and authorized the issuance of an order to report for civilian work, entering in its records the following notation: "Case reviewed by Local Board. No New information received concerning case."

Defendant failed to report as ordered on February 10, 1969 but appeared at his local board two weeks later, stating that he was once again working for a shirt-making company in Philadelphia and had just received the order. He also signed the following statement:

"In regard to my employment at The Norristown State Hospital. as a minister of Jehovah's witness I am unable to accept this employment due to Consience, being that this would be a substitue for Military Service, would be making it a compromise, being a baptized Minister of God Jehovah ordianed to Proclaim the kindgom, good news as a scriptural command."

Defendant was again ordered to report for civilian work on October 20, 1969. He appeared at his local board on October 6 and submitted another written statement, refusing to obey the order because "this to me would be a compromise and would be breaking my Integrity to God. * * *" It is defendant's refusal to report to Norristown State Hospital on October 20, 1969 which formed the basis for his indictment and conviction.

I

Defendant first maintains that his order to report for civilian work was invalid because it was based upon an erroneous classification of him as a conscientious objector by the local board on May 16, 1966 and by the appeal board on November 30, 1966. He relies on 32 C.F.R. § 1623.2, which provides in pertinent part:

"Every registrant shall be placed on Class I-A * * * except that when grounds are established to place a registrant in one or more of the classes listed in the following table, the registrant shall be classified in the the lowest class for which he is determined to be eligible, with Class I-A-O considered the highest class and Class

I–C considered the lowest class according to the following table:

"Class: I–A–O

    I–O

 *  *  *  *  *  *

    IV–D

 *  *  *  *  *  *

    I–C"

Thus, regardless of defendant's status as a conscientious objector, the local board was required to place him in Class IV–D if he presented sufficient facts in support of his claim for a ministerial exemption.

Under the provisions of 50 U.S.C. App. § 456(g), "[r]egular or duly ordained ministers of religion, as defined in this title, * * * shall be exempt from training and service (but not from registration) under this title. * * *" *See* 32 C.F.R. § 1622.43. As defined in the Military Selective Service Act of 1967, a "regular or duly ordained" minister of religion is one who, as his regular and customary vocation, preaches and teaches his religion and who has either been duly ordained in accordance with church ritual or, without having been formally ordained, is nevertheless recognized by his church as a "regular minister." 50 U.S.C. App. §§ 466(g) (1)–(2). Those persons who do not regularly, as a vocation, teach and preach the principles of their sect and conduct public worship in the tradition of their religion are ineligible for a ministerial exemption, regardless of whether they have been duly ordained. 50 U.S.C. App. § 466(g) (3).

■ In sum, in order to qualify for a ministerial exemption, the registrant must satisfy the following tripartite test: (1) he must show a regularity of religious preaching and teaching; (2) the ministry must be his main and pri-

mary calling, his vocation rather than avocation; and (3) his standing in the congregation must be recognized as that of a minister or leader of a group of lesser members. McCoy v. United States, 403 F.2d 896, 900 (5th Cir. 1968); United States v. Hurt, 244 F.2d 46, 50 (3d Cir. 1957); United States v. Simms, 285 F.Supp. 981 (D.Del. 1968). We find that defendant's own evidence was inadequate with respect to the second of these criteria and that a basis in fact therefore existed for the board's denial of a IV–D exemption.

■ It is settled that merely because a registrant belongs to Jehovah's Witnesses, all of whose members claim to be ministers, he does not thereby become automatically entitled to the ministerial exemption under the statute and regulations. Each registrant "bears the burden of clearly establishing" that he has satisfied all the criteria for the exemption and is thus a minister in the statutory sense. Dickinson v. United States, 346 U.S. 389, 395, 74 S.Ct. 152, 98 L.Ed. 132 (1953); United States v. Hagaman, 213 F.2d 86, 92 (3d Cir. 1954). "Preaching and teaching the principles of one's sect, if performed part-time or half-time, occasionally or irregularly, are insufficient to bring a registrant under § 6(g). These activities must be regularly performed. They must, as the statute reads, comprise the registrant's 'vocation.'" Dickinson v. United States, *supra*, 346 U.S. at 395, 74 S.Ct. at 157.

■ The Watchtower Society of Jehovah's Witnesses, in recognition of these principles, has made full-time missionary field preaching the test of the right to a ministerial exemption. As a result, the Society does not generally support the claims of registrants below the rank of "Pioneer"[1] unless the circumstances of a particular case indicate that the registrant regularly devotes a

---

1. By definition, Pioneers are required to devote at least 100 hours per month to the field ministry. For a comprehensive explanation of the hierarchy of Jehovah's Witnesses, see United States v. Tettenburn, 186 F.Supp. 203 (D.Md. 1960).

substantial enough amount of time to the ministry to make it his vocation. United States v. Stidham, 248 F.Supp. 822, 839–840 n. 9 (W.D.Mo.1965); United States v. Tettenburn, 186 F.Supp. 203, 208–209 (D.Md.1960). We agree with this view. While Pioneer status should ordinarily qualify a registrant for the exemption, we believe that it should not be the determinative factor and that each Jehovah's Witness should be classified regardless of his title according to whether he himself has made religious teaching and preaching his regular and customary vocation. Cox v. United States, 332 U.S. 442, 450, 68 S.Ct. 115, 92 L.Ed. 59 (1947); United States v. Hurt, *supra*, 244 F.2d at 51–52; *cf.* United States v. Hawver, 437 F.2d 850, 854 (7th Cir. 1971).

In the present case, the documentation submitted to defendant's local board indicated that he was a Book Study Conductor—the lowest titled position in a congregation—devoting approximately 113 hours per month to the ministry. Of this total, 60 hours per month ("two hours each day") were listed as spent in the personal study of religious periodicals and books, with the remaining 53 hours spread among such diversified activities as talking to people about the Bible (4 hours); calling on the "spiritually weak and physically sick" (3 hours); preparing for, attending, and participating in local congregation meetings (28 hours); counseling others before and after meetings (6 hours); and door-to-door preaching and travel incidental thereto (12 hours). Aside from the fact that defendant devoted more than half of the claimed 113 hours to personal study rather than "preaching and teaching," [2] we believe that he failed to make even a prima facie showing that the ministry was his vocation.

■ At the time he filed his Form 150, defendant indicated that his "usual occupation" was as a stock boy at an average of 48 hours per week, and at his personal appearance he claimed to be working more than 40 hours a week as a shirt-maker's helper. We realize that the existence of secular employment is not in itself inconsistent with the statutory definition of a "regular or duly ordained minister," but we do think that where, as here, a Jehovah's Witness below the rank of Pioneer spends appreciably more time at a secular job than at his church-related activities he cannot claim that the ministry is his real vocation. We believe that this conclusion is particularly reinforced in this case by the fact that defendant performed his religious activities almost exclusively during what would appear to be his spare time, namely at night and on weekends. We therefore conclude that defendant failed to show anything more than the "part-time or half-time" ministry which the Supreme Court described in *Dickinson* as insufficient. *Cf.* Cox v. United States, *supra,* 332 U.S. at 444–445, 68 S.Ct. at 115–116.

At trial, defendant introduced into evidence an unidentified sheet of paper which he claimed was sent from Pennsylvania State Selective Service Headquarters to his local board prior to the

---

2. In its brief, the Government argues that the 60 hours of personal study, as well as most of defendant's other religious activities, would not "distinguish the defendant from most members of his congregation" and should not be considered in determining his entitlement to an exemption.

While we think that extensive personal study alone could obviously not form the basis for a ministerial classification, we need not decide whether it should be considered a ministerial activity when combined with and as a necessary incident to the registrant's preaching duties. Rather, we believe that, even if the full 113 hours were considered, defendant's claim was properly denied. We do note, however, that the Watchtower Society does not permit its ministers to include travel time, study time, and time spent at meetings in the minimum number of hours they must spend preaching in the missionary field. United States v. Tettenburn, *supra* 186 F.Supp. at 209.

time his ministerial claim was considered. This document (Exhibit D–2) reads in its entirety:

"JEHOVAH'S WITNESS

Those entitled for consideration of 4–D are—

1—Leader of Local Congregation—NOT SERVANT.

2—* Pioneer — regular — NOT VACATION.

3—Member of Beth-el Family—New York Group.

Review files of the above groups each year."

We agree with defendant's claim that D–2 embodies an improper legal standard since it places undue emphasis upon the registrant's formal title and precludes the consideration of each individual claim according to whether the registrant has in fact made the ministry his vocation. We do not agree with defendant, however, that the mere existence of D–2 proves that it formed the basis for the local board's decision and, from our review of the record, we find the testimony concerning this document so inconclusive as to render it virtually meaningless.

█ The Executive Secretary of defendant's local board, Mrs. Lillian Moore, produced D–2 in response to a query by defense counsel about the promulgation of state or national guidelines for the granting of ministerial exemptions to Jehovah's Witnesses. At the same time, Mrs. Moore also produced a two-page memorandum from State Headquarters entitled "Determination of Ministerial Status of Certain Registrants" and dated March 31, 1954 (Exhibit D–1). We note that D–2, unlike D–1, bears no identifying markings, is not numbered consecutively with the pages of D–1, and was not attached to it. Mrs. Moore was unable to state whether the two exhibits were both part of one memorandum or even whether

D–2 originated from State Headquarters. She further testified that the board had received more recent information concerning ministerial classifications but said she "assumed" that D–2 was in effect at the time defendant was classified and that it was followed by the board. We find no explanation or foundation for this assumption in the record other than the leading questions of defense counsel. In the absence of any evidence concerning D–2's origin, its effective date, the date of its rescission, or its effect upon defendant's classification, we find no basis for concluding that defendant's local board applied an improper legal standard.

Indeed, defendant's allegation that his local board relied on D–2 is belied by the minutes of his personal appearance. The board inquired, for example, into the nature of defendant's secular employment, his hours and wages, his religious beliefs, and his church duties and the hours spent in performing them. Nowhere is there any indication that defendant was questioned at all about his specific title within the hierarchy of Jehovah's Witnesses. We believe that the local board was not intent on applying the simplistic and mechanical standards set out in D–2 but, rather, properly took every relevant factor into consideration before acting on defendant's ministerial claim. *See* Robertson v. United States, 417 F.2d 440, 446 (5th Cir. 1969) (en banc).

Defendant argues further that, even if there is no proof of reliance on an improper legal standard, his order to report for civilian work was still invalid because neither the local board nor the appeal board stated any reasons for its denial of the claimed exemption. He relies on this Court's decision in Scott v. Commanding Officer, 431 F.2d 1132 (3d Cir. 1970), in which we required a statement of reasons for the denial of a prima facie case for conscientious objector status. We need not decide whether the *Scott* rule should be extended to the denial of ministerial classifications be-

cause, as stated above, we believe that Pompey failed in any event to establish a prima facie case. *Cf.* United States v. Campbell, 439 F.2d 1087 (9th Cir. 1971).

■ We therefore find a basis in fact for defendant's classification as I-O instead of IV-D, and we now proceed to the arguments concerning defendant's processing subsequent to his final classification by the appeal board on November 30, 1966.

## II

Defendant argues that his local board erred in failing to reopen his classification upon receiving his letters of September 8, 1967, and January 16, 1968, in which he stated first that he had moved to Georgia to serve as a "regular minister" and "Missionary Evangelist" and, later, that he was "serving as a pioneer Missionary Minister." He relies heavily on the following statement by the Supreme Court in Mulloy v. United States, 398 U.S. 410, 416, 90 S.Ct. 1766, 1771, 26 L.Ed.2d 362 (1970):

> "Where a registrant makes non-frivolous allegations of facts that have not been previously considered by his board, and that, if true, would be sufficient under regulation or statute to warrant granting the requested reclassification, the board must reopen the registrant's classification unless the truth of these new allegations is conclusively refuted by other reliable information in the registrant's file."

Although defendant argues that the two letters in question did present non-frivolous allegations of new facts which, if true, would warrant the granting of a ministerial exemption, we must first consider whether a local board's duty under *Mulloy* becomes operative only when the registrant has requested a reopening and, if so, whether defendant's local board was justified in believing that no such request was being made in the present case.

■ In *Mulloy*, the Supreme Court was construing 32 C.F.R. § 1625.2, which reads in part as follows:

> "The local board may reopen and consider anew the classification of a registrant (a) upon the written request of the registrant, * * * if such request is accompanied by written information presenting facts not considered when the registrant was classified which, if true, would justify a change in the registrant's classification; or (b) upon its own motion if such action is based upon facts not considered when the registrant was classified which, if true, would justify a change in the registrant's classification. * * * "

The defendant contends that *Mulloy* had the effect of changing the word "may" at the beginning of this regulation to "must". We agree insofar as subsection (a) is concerned but disagree with this construction with respect to subsection (b). While the Supreme Court did not distinguish in its opinion between the two provisions, we think it is clear both from the facts in *Mulloy* and from the language of the decision itself that a local board's mandatory duty to reopen exists only when a registrant has in fact requested a reopening and has buttressed his request with non-frivolous allegations of new facts which prima facie entitle him to a reclassification. In our view, *Mulloy* does not require a local board to reopen a classification on its own motion when the registrant himself has made no claim and requested no further consideration of his classification.

■ The defendant argues, however, that every submission of new facts "carries an implicit request to reopen." We would agree that a registrant, untutored in the intricacies of Selective Service procedures, should not be required to quote the language of the regulations in order to be afforded all the procedural rights to which he is entitled. *See* United States v. Thompson, 431 F.2d 1265 (3d Cir. 1970); *cf.* United States v. Turner, 421 F.2d 1251 (3d Cir. 1970). But we do think it essential that he indicate in some way that he is dissatisfied with his classification,

wishes to have it changed, and is submitting new information for this reason and not merely to comply with his duty to keep the board informed of his current status, physical condition, or address, as required by 32 C.F.R. § 1641.7. To hold otherwise, we believe, would impose an extraordinary administrative burden on the Selective Service System by requiring it to treat every "change of status" letter as an implied request for a reopening regardless of whether the registrant himself has expressed a desire to be reclassified.

 We believe that the facts of this case, as stated above, indicate that defendant's local board was justified in proceeding on the reasonable assumption that defendant's two letters from Georgia were not written with the intention that his ministerial claim be reconsidered but, rather, were written solely to notify the board of a change of address and to explain that he would not perform alternate civilian service as a conscientious objector. *Cf.* United States v. Silvera, 441 F.2d 1152 (3d Cir. 1971). In the words of the Ninth Circuit, the defendant "did not request that the classification be reopened. He advised, but did not request." Taylor v. United States, 285 F.2d 703, 704 (9th Cir. 1960) (en banc).[3]

We note in addition, however, that the letters generally appear to be cumulative of information which was already before the board, had been considered previously, and would therefore not warrant a reopening under 32 C.F.R. § 1625.2. The only possible exception was defendant's reference to his status as a "pioneer

Missionary Minister," and we believe that this reference alone, unsupported by any objective facts to indicate that defendant's ministry had then changed from his avocation to his vocation, would not justify a reopening. *See* United States v. Chacon, 436 F.2d 411, 413 (5th Cir. 1971); United States v. Mohammed, 288 F.2d 236, 241–242 (7th Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 37, 7 L.Ed.2d 26 (1961).[4]

We therefore conclude that defendant's order to report for civilian work was valid.

The judgment of the district court will be affirmed.

---

3. Since we hold that the local board was reasonably entitled to believe that defendant had not filed a written request for a reopening, there is likewise no merit to defendant's claim that the board failed to meet its obligation under 32 C.F.R. § 1625.4 of notifying him that his classification would not be reopened.

4. At trial, defendant admitted that, while in Georgia, he was in fact only a Vacation Pioneer. "By definition, Vacation Pioneers are not regular ministers of the Watchtower Society. They are on the Pioneer List temporarily" and engage in the Pioneer ministry only when they are free for short periods of time to do so. Robertson v. United States, 417 F.2d 440, 445 (5th Cir. 1969) (en banc). Since defendant could not have shown the necessary regularity of religious activity, he would not have been entitled to the exemption in any event and was not prejudiced by the local board's action. *Cf.* United States v. Thompson, 431 F.2d 1265, 1272 (3d Cir. 1971).